# Illinois Official Reports

## Appellate Court

---

### *People v. Holloway*, 2019 IL App (2d) 170551

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. THOMAS HOLLOWAY, Defendant-Appellant. |
| District & No. | Second District<br>No. 2-17-0551 |
| Filed | December 6, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Du Page County, No. 15-CF-2148; the Hon. Liam C. Brennan, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd, Thomas A. Lilien, and Phyllis J. Perko, of State Appellate Defender's Office, of Elgin, for appellant.<br><br>Robert B. Berlin, State's Attorney, of Wheaton (Lisa Anne Hoffman and Mary A. Fleming, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE SCHOSTOK delivered the judgment of the court, with opinion.<br>Justices Hutchinson and Burke concurred in the judgment and opinion. |

**OPINION**

¶ 1    After a jury trial, defendant, Thomas Holloway, was convicted of violation of bail bond (720 ILCS 5/32-10(a) (West 2014)) and was sentenced as a Class X offender (730 ILCS 5/5-4.5-95 (West 2014)) to nine years' imprisonment. On appeal, he argues that he was denied a fair trial because his attorney-client privilege was violated. We affirm.

¶ 2                                    I. BACKGROUND

¶ 3    The indictment against defendant alleged that, on April 26, 2014, he was admitted to bail in case No. 12-CF-2466, a prosecution for unlawful delivery of a controlled substance; that, on August 25, 2015, his bond was forfeited;[1] and that he willfully failed to surrender himself within 30 days after the forfeiture.

¶ 4    The State moved *in limine* to admit the testimony of James Murphy-Aguilu, defendant's attorney in case No. 12-CF-2466. The motion alleged as follows. On August 25, 2015, Murphy-Aguilu appeared for trial. He told the court that he had spoken to defendant by telephone and defendant had said that he was in the parking lot. In the present case, the State planned to call Murphy-Aguilu to testify about his conversation and defendant's failure to appear that day. The attorney-client privilege did not bar this testimony, because defendant had not been seeking legal advice and his call was not related to any such purpose. Alternatively, the communication was within the crime-fraud exception to the privilege, because defendant was attempting to deceive Murphy-Aguilu, as he was not in the parking lot and never appeared for trial.

¶ 5    The State's motion attached a transcript from the August 25, 2015, hearing. Murphy-Aguilu was present for defendant, and Assistant State's Attorney Claudia Fantauzzo appeared for the State. The transcript read:

"[THE] COURT: Well, for the record, it's 11:35, and we're here for trial. If everyone can identify.

MS. FANTAUZZO: Claudia Fantauzzo for the People.

MR. MURPHY-AGUILU: James Murphy-Aguilu, Murphy hyphen A-g-u-i-l-u.

*Your [H]onor, I actually spoke with him about 20 minutes ago. He claimed to be in the parking lot. It would seem pretty impossible for him to be in the parking lot still. I don't know where he is.*

THE COURT: Any luck reaching out to him since?

MR. MURPHY-AGUILU: The last call I just got a hangup [*sic*], so—

THE COURT: All right. Well, at this time a bond forfeiture and a no bond warrant will issue.

MS. FANTAUZZO: Thank you, [Y]our Honor.

THE COURT: And what is the judgment of forfeiture date?

MS. FANTAUZZO: 9/29.

THE COURT: Let's go to the 30th.

---

[1] In fact, August 25, 2015, is the date defendant failed to appear. His bond was forfeited on October 7, 2015. No claim of error is raised on appeal regarding this mistake.

THE COURT: 9/30/15 for judgment on forfeiture.

MS. FANTAUZZO: Thank you, Judge.

THE COURT: All right. Thank you.

MR. MURPHY-AGUILU: Is there any possibility of doing a different date? My wife is actually due on the 28th, so—

THE COURT: Yes, sure there is.

MR. MURPHY-AGUILU: I'm going to be back here a week from that date, so the 7th?

THE COURT: That's fine.

MR. MURPHY-AGUILU: Just for a quick status.

THE COURT: All right. 10/7—

MR. MURPHY-AGUILU: Thank you.

THE COURT : —for judgment of forfeiture." (Emphasis added.)

For convenience, we shall refer to the emphasized passage as the "parking-lot statement."

¶ 6    Defendant did not file a written response to the motion. At a hearing on the motion, the following colloquy ensued:

"MR. WIGELL [(DEFENDANT'S ATTORNEY)]: *** Conceptually, I have no difficulty with the State's motion, especially regarding the privilege, but we know how live witnesses are.

They could say all sorts of things. Like the attorney could say, Well, he told me he was guilty in the underlying charge, so I didn't even know why we wanted to go to trial.

THE COURT: That would be, of course, what we call a mistrial.

MR. WIGELL: I understand that, Judge. But my suggestion is that if it's regarding what was going to be the stipulated testimony or what the proffered testimony was today by the State, then I have no difficulty with this motion *in limine*.

If, however, it expands to some other areas, then I might renew my objection to violating the privilege.

THE COURT: Well, I believe in this circumstance, the caselaw does allow for the vitiation of the privilege, and I will enter an order in that regard to protect any issues as it relates to Mr. Murphy[-]Aguilu and licensure issues.

Obviously, the privilege is not universally vitiated. Confidential communications that are unrelated to the material issues in this case remain, and we will, and the State I presume will, advise Mr. Murphy[-]Aguilu of that. And if there's a problem, we'll address the problem at trial.

MR. WIGELL: Thank you, Judge."

¶ 7    On the morning before trial, Murphy-Aguilu told the court that the State had subpoenaed him and he feared that he would be compelled to testify to privileged conversations with defendant. He believed that "even the scheduling issue might be related" to the privilege. Murphy-Aguilu said that he had no problem testifying about his actions, but he believed that testifying to any of his conversations with defendant would be an ethical violation.

- 3 -

¶ 8 Assistant State's Attorney Thomas Minser told the court that he intended to elicit the parking-lot statement. Assistant State's Attorney Sean Kelly added that Murphy-Aguilu had told him that he recalled saying that he expected defendant to appear but did not recall his exact words. The State would elicit this testimony and then use the August 25, 2015, transcript to ask Murphy-Aguilu whether he recalled making the parking-lot statement. At that point, Murphy-Aguilu would decline to answer, and the State would not question him further on the matter.

¶ 9 Wigell then addressed the court as follows. His concern was that, if Murphy-Aguilu invoked the attorney-client privilege, Wigell might not have a sufficient opportunity to cross-examine him. The judge pointed out that defendant could waive the privilege and thereby give Wigell "unfettered cross-examination." Wigell expressed concern that the State was "trying to narrow" the examination of Murphy-Aguilu to the point where it would "get out all the bad stuff against [defendant] but not allow anything without the waiver that the Court suggests."

¶ 10 The judge observed that Wigell was arguing that the attorney-client privilege put him at a disadvantage, yet defendant could control whether the privilege was waived. Wigell responded that, if defendant chose not to waive the privilege, it would restrict Wigell's ability to cross-examine Murphy-Aguilu "as to his refusal." Wigell was concerned that defendant would be forced to choose between the privilege and his right to cross-examination and would have to give up the former to exercise the latter.

¶ 11 The judge asked Kelly why the State needed to ask Murphy-Aguilu questions that would prompt him to assert the privilege, as Kelly knew would happen, when what the State really wanted was to introduce the transcript excerpt. Kelly responded that, if Murphy-Aguilu initially testified that he did not remember what he had told the court, the State would be entitled to use the transcript to refresh his recollection. That would be the extent of the State's inquiry: Kelly would ask Murphy-Aguilu, not about the conversation with defendant itself, but only what he had told the court.

¶ 12 Kelly said that he expected that he would ask whether Murphy-Aguilu made the parking-lot statement to the court, Murphy-Aguilu would refuse to answer, owing to the privilege, and that would end the State's questioning in that area. Again, he said, he would ask Murphy-Aguilu what he told the court, not directly about his conversation with defendant.

¶ 13 After a recess, the judge stated as follows. Contrary to what he had stated previously, the attorney-client privilege was not necessarily vitiated here. However, the judge did not see how Murphy-Aguilu could assert that it applied to a statement that he had made in open court. "To the extent that that reference[d] a privilege, he waived it by going there in open court." Thus, the privilege did not apply to questioning about the parking-lot statement. The judge noted that he had erred in finding "a wholesale vitiation of the privilege as to conversations." However, the State was not "going in that direction." The judge reiterated that he was aware of Wigell's argument that it was unfair to require defendant to choose between the attorney-client privilege and his right to cross-examination.

¶ 14 The cause proceeded to trial. The State first called Murphy-Aguilu. On direct examination, he testified that, in 2014 and 2015, he made numerous appearances for defendant. In June 2015, with Murphy-Aguilu and defendant present in court, the case was set for trial on August 25, 2015. On August 25, 2015, Murphy-Aguilu appeared, as did Fantauzzo. Defendant did not appear. The parties were "set to start at 9:30 that day. So, we were all here early. And then we waited probably closer to noon before we *** finally moved on."

- 4 -

¶ 15		Murphy-Aguilu testified that, while he was waiting for defendant to appear, he attempted to contact him by calling the number that they had been using since he started representing defendant. He spoke with defendant. He then told the court that he expected defendant to be in court at some point that day.

¶ 16		The direct examination continued:

> "Q. You said you informed the Court that you expected him to be there.
>
> Isn't it true that you told the Court, quote, 'Your Honor, I actually spoke with him about 20 minutes ago. He claimed to be in the parking lot. It would seem pretty impossible for him to be in the parking lot still. I don't know where he is'?
>
> A. I don't believe I can answer that question."

Defendant did not object to any of the foregoing.

¶ 17		The direct examination continued as follows. After defendant failed to appear on August 25, 2015, a warrant was issued for him and a date—October 7, 2015—was set for bond forfeiture. On that date, Murphy-Aguilu appeared, defendant did not, and the court entered a judgment of bond forfeiture. A hearing was set for November 30, 2015. That day, Murphy-Aguilu appeared; defendant did not. The case was set for trial on February 18, 2016. That day, Murphy-Aguilu appeared, defendant did not, and defendant was tried and convicted. Murphy-Aguilu had no contact with him between August 25, 2015, and February 18, 2016.

¶ 18		Murphy-Aguilu testified that, as best he could remember, defendant did not miss any court dates until August 25, 2015.

¶ 19		On cross-examination, Murphy-Aguilu testified as follows. He and defendant probably made 10 to 15 court appearances together. They had met numerous times in Murphy-Aguilu's office and often discussed whether to elect a jury trial. On February 18, 2016, defendant was found guilty *in absentia*, and Murphy-Aguilu continued to represent him until the case was over.

¶ 20		Defendant asked Murphy-Aguilu whether he received any money from defendant's bond. The State objected. In a sidebar, defendant argued that the questioning was relevant to show that Murphy-Aguilu "was interested in the money, not in informing his client of his rights." Defendant's theory was that he had not absented himself willfully but had done so only because Murphy-Aguilu had not properly informed him; he had called defendant only once. The court concluded that Murphy-Aguilu's motives were irrelevant to whether defendant had acted willfully. It sustained the State's objection unless and until defendant could show that Murphy-Aguilu's motives were relevant.

¶ 21		The State next called Norman Hall. On direct examination, he testified as follows. He was chief of investigation for the Du Page County State's Attorney's office and a former police officer. On or about October 15, 2015, Fantauzzo assigned him to locate defendant. After checking the Law Enforcement Agencies Data System (LEADS), he spoke to Eula Allen, defendant's grandmother, who lived at 150 Eastern Avenue in Bellwood. She told him that defendant had resided with her but was no longer living there, and she gave him a phone number to call. Hall also checked the websites of the Department of Corrections (DOC) and the Cook, Kane, Will, and Du Page County jails. According to the websites, defendant was not in custody in the DOC or any of those jails.

¶ 22    On October 20, 2015, Hall called the number that Allen had given him. He heard a recording saying that the voice mail was disconnected. A few minutes later, at his office, Hall received a call back from the number. He answered, "[I]nvestigations." The caller hung up.

¶ 23    Hall testified that, on February 10, 2016, he again investigated defendant's whereabouts, checking the DOC and county jail websites and another law-enforcement database. There was no indication of defendant's location. Hall called the number that Allen had given him in October. A male answered. Hall asked whether he was "Thomas." The man said yes. Hall told him that he was with the State's Attorney's office, that the office had a case pending in Du Page County court, and that Thomas needed to attend it. The man said, " 'You've got the wrong Thomas,' " and hung up.

¶ 24    Hall testified that, later on February 10, 2016, he called Tamika Richards, an associate of defendant. Hall left a message identifying himself, explaining that he had a case involving someone whose whereabouts she might know, that she was in no trouble, and that he wanted her to call him. He did not receive a call back. Also that month, Hall called Allen. He left a message telling her that he needed to talk to her about defendant. He did not receive a call back.

¶ 25    Hall identified two State exhibits as bail-bond slips. Each, which identified defendant, specified the bail and the bond required, gave defendant's court date, and provided a space for defendant and someone posting bond for him to sign. The first slip gave defendant's name and listed his address as "150 Eastern Avenue, Chicago [*sic*], Illinois 60104." It was signed, "Thomas Holloway." The second one gave the same name and address and "12-CF-2466," the number of the pending case. It also stated that the next court date was August 25, 2015, at 10 a.m. Hall testified that he had filled out bail-bond slips thousands of times. When officers do this, they forward the original form and the money to the circuit court clerk's office, keep a copy in police files, and give a copy to the person they just arrested.

¶ 26    Hall identified another exhibit as a certified copy of a driver's license abstract. It provided the name "Thomas Holloway" and the address "150 Eastern Avenue[,] Bellwood[, Illinois] 60104" and stated that on August 25, 2015, he had a valid license.

¶ 27    Hall testified that, to aid in locating defendant, he contacted Dean Balesteri, a Chicago police officer. On February 17, 2016, Hall left phone messages for Allen and Richards.

¶ 28    Hall testified on cross-examination as follows. He had never met defendant and had not been involved in his arrest or in filling out the bond forms. Hall searched the jail websites for Cook, Du Page, Kane, and Will Counties, but not for other nearby counties, such as Kendall. On redirect examination, Hall testified that, although the bail-bond slips referred to "Eastern Avenue" in Chicago, there was no such street in Chicago.

¶ 29    Balesteri testified as follows. On March 24, 2016, he and several other officers went to a residential building on South Wood Street in Chicago in connection with the outstanding warrant in case No. 12-CF-2466 (and warrants in other cases). Balesteri had several photographs of defendant. He rang the doorbell. Defendant answered. Balesteri took him into custody.

¶ 30    The trial court admitted the bail-bond slips and several orders from case No. 12-CF-2466. Defendant put on no evidence.

¶ 31    In argument, the State observed that it needed to prove that defendant had been admitted to bail for appearance before the court, that he had forfeited the bail, and that he had willfully

failed to surrender himself within 30 days following the forfeiture. The State contended that the bail-bond slips proved the first proposition by showing that in June 2015 defendant was admitted to bail for an appearance before the court on August 25, 2015. The order of October 7, 2015, entering the judgment of forfeiture, proved the second proposition.

¶ 32    Finally, the State argued, it had proved that defendant's failure to surrender himself in time had been willful. Defendant had known about the August 25, 2015, court date: he was in court when it was set, and the bail-bond slips, which he signed, told him the date. Murphy-Aguilu had testified credibly that, on August 25, 2015, he appeared in court but defendant did not. Murphy-Aguilu had also testified that he called defendant that day and, based on the call, he expected him to appear. Moreover, the bail-bond slips told defendant in detail what would happen if he did not show up, including forfeiting the bond and incurring a debt for the rest of the bail, which was thousands of dollars. Common sense dictated that defendant's failure to appear again in the case was not an oversight.

¶ 33    In his argument, defendant contended solely that the State had not proved willfulness. He stressed Murphy-Aguilu's limited efforts to contact him and remind him of his obligation to appear. All the State had shown was that he called defendant once. Defendant continued:

"Mr. Murphy [*sic*] says *** I called him. *He said he was in the parking lot or something like that*. And he reports that to the Judge. What effort did he make to protect his client? ***

Thomas is facing a serious charge, has an attorney. That's all true. But what's the attorney going to say when his client doesn't show up? *He's going to say, oh yeah, he was in the parking lot*. We don't have a verification. We don't know what number he called." (Emphases added.)

¶ 34    Defendant continued, "The communication here just didn't exist." He maintained that Murphy-Aguilu had lied because he did not want defendant to appear. Defendant also argued that, even if he had received copies of the bail-bond slips informing him of the August 25, 2015, court date, it did not follow that he actually read them or understood what they said.

¶ 35    In rebuttal, the State argued that the issue was not what Murphy-Aguilu did or why he did it, but what defendant did, *i.e.*, fail to appear in court on August 25, 2015, or anytime thereafter. The State noted that, on the day that trial was set for August 25, 2015, defendant was in court with his attorney and "posted thousands of dollars" to secure his presence on that date. The bail-bond slips had told him that he would forfeit his bond if he did not appear. It defied common sense to suggest that he simply forgot to appear and then forgot to surrender himself within 30 days after the judgment.

¶ 36    While deliberating, the jury sent the court a note reading, "[I]s the Defendant responsible to surrender within 30 days of forfeiture regardless of communication with his attorney or the Court?" With the parties' agreement, the court responded, "The law necessary to reaching your verdict is contained in the instructions you have been provided. Please continue to deliberate."

¶ 37    The jury found defendant guilty. He filed a motion for a new trial. It contended in part that the court had erred in limiting the cross-examination of Murphy-Aguilu. Specifically, "Murphy-Aguilu bizarrely claimed that he believed he was prohibited by rules [of] professional conduct from testifying as to a remark he previously made on the record in open court" while he was representing defendant in case No. 12-CF-2466. The motion contended that "it had been suggested that the limits of the cross-examination would be relaxed if

[defendant] waived his right to attorney-client privilege." However, the motion argued, his right to cross-examination should not have been conditioned on his relinquishment of his privilege. The trial court denied the motion. After it sentenced defendant as noted, he timely appealed.

¶ 38                                    II. ANALYSIS

¶ 39        On appeal, defendant contends that the State violated his attorney-client privilege by asking Murphy-Aguilu whether he had made the parking-lot statement. Defendant argues that the privilege belonged to him and that he never waived it (and Murphy-Aguilu had no authority to do so unilaterally), that the parking-lot statement came within the privilege, and that the State's improper recitation of the statement prejudiced him. Defendant concedes that he did not raise this specific claim of error at the trial level, but he asks that we address it as plain error.

¶ 40        The State responds in three ways. First, defendant forfeited or waived his present claim of error by failing to raise it in the trial court. Second, there was no error, because the parking-lot statement was not privileged. Third, any error was harmless, given the strength of the State's evidence on the sole contested issue of willfulness.

¶ 41        In reply, defendant contends in part that he did not forfeit the issue. He argues that, in opposing the State's motion *in limine*, he invoked the attorney-client privilege, that he did not need to object at trial, and that he renewed the objection in his posttrial motion.

¶ 42        For the reasons that follow, we hold that defendant not only forfeited his claim but invited the alleged error and may not raise it now. We also hold that there was neither error nor prejudice.

¶ 43        We first turn to forfeiture and invited error. First we set out general rules. To preserve a claim of error, a defendant must both make a timely objection and raise the claim in his posttrial motion. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). However, in a criminal case, a defendant who raises his objection in a proceeding on a motion *in limine* need not object again during the trial. *People v. Denson*, 2014 IL 116231, ¶¶ 19-20, 24.

¶ 44        Invited error differs from mere forfeiture. A defendant might not merely forgo objecting to an alleged error but actively invite or acquiesce in it. *People v. Harding*, 2012 IL App (2d) 101011, ¶ 17. To allow the defendant to use a ruling or action that he secured at trial as the basis of a reversal on appeal would be unfair to the State and encourage defendants to become duplicitous. *Id.* Thus, invited error does not raise a mere forfeiture to which the plain-error exception might apply; it creates an estoppel that precludes plain-error analysis. *Id.*

¶ 45        The invited-error doctrine applies when a defendant claims error in the admission of evidence but deliberately acquiesced in the alleged error as a matter of trial strategy. See *People v. Stewart*, 2018 IL App (3d) 160205, ¶¶ 19-21 (as a matter of strategy, defendant explicitly acquiesced in admission of evidence); *People v. Cox*, 2017 IL App (1st) 151536, ¶ 76 (defendant repeatedly told court he had no objection to admission of evidence); *People v. Martinez*, 62 Ill. App. 3d 7, 14-15 (1978) (so as to attack State witness's credibility, defendant acquiesced in admission of evidence of witness's attempts to negotiate immunity for defendant); *People v. Robinson*, 20 Ill. App. 3d 777, 783 (1974) (defendant not only acquiesced in admission of alleged hearsay but attempted to use testimony to attempt to weaken State's case).

¶ 46       Both forfeiture and the invited-error doctrine apply here. The latter is more important. Defendant not only acquiesced in the State's use of the parking-lot statement to refresh Murphy-Aguilu's recollection of August 25, 2015, but attempted to use the statement to discredit Murphy-Aguilu and advance the theory that he deliberately neglected to remind defendant of the trial date or any future proceedings. Defendant pursued this strategy in order to suggest to the jury that his failure to appear on August 25, 2015, was not willful but inadvertent.

¶ 47       At the hearing on the motion, Wigell initially said that he had "no difficulty with the State's motion, especially regarding the privilege." Wigell expressed concern that Murphy-Aguilu's testimony could range *beyond* the parking-lot statement, but that was a different matter.

¶ 48       At the hearing immediately before trial, Wigell expressed further concern that the existence of the attorney-client privilege could limit his cross-examination of Murphy-Aguilu. But he never directly opposed the questioning that the State anticipated. This was the closest that the defense ever came to raising the argument that defendant raises on appeal.

¶ 49       At trial, when the State confronted Murphy-Aguilu with the parking-lot statement, defendant did not object at all, much less raise the attorney-client privilege. Although this does not establish forfeiture, it supports applying the invited-error rule. In cross-examining Murphy-Aguilu, defendant sought to elicit evidence that the former attorney had had a financial interest in defendant's nonappearance. He explained to the court that the questioning was relevant to proving that Murphy-Aguilu had had an ulterior motive to lull defendant into failing to appear, which, he asserted, would cut against the willfulness element. The court sustained the State's objection to this line of inquiry. But in his closing argument, defendant returned to the theory—and he used the parking-lot statement to bolster it.

¶ 50       Although the State's closing argument did not mention the parking-lot statement, defendant did, and not to contend that it violated his privilege by revealing what he had told Murphy-Aguilu. Quite the opposite: defendant twice quoted the parking-lot statement because he wanted to persuade the jury that Murphy-Aguilu fabricated a remark that defendant never made. Wigell told the jury, "Mr. Murphy [*sic*] says *** I called him. *He said he was in the parking lot or something like that*." (Emphasis added.) He then suggested that the statement had been Murphy-Aguilu's ruse to mislead the trial court and that it was uncertain that he had even called defendant. Finally, Wigell stated flatly, "The communication here just doesn't exist."

¶ 51       Thus, at trial, defendant did not *neglect* to object to the State's recitation of the parking-lot statement; there was no mere procedural default. He consciously decided that the jury should hear the parking-lot statement—and should hear it again in his closing argument, where he used it to bolster his theory that Murphy-Aguilu lulled him into failing to appear in court.

¶ 52       We note that defendant's strategy was not without effect, although the jury eventually rejected it. The jurors' note to the court showed serious interest in defendant's theory that Murphy-Aguilu's deliberate neglect cast doubt on whether defendant's absence had been willful. And that theory was explicitly based partly on the proposition that the parking-lot statement proved that Murphy-Aguilu used trickery to lull defendant into not appearing. The last thing that defendant wanted the jurors to believe about the parking-lot statement was that it conveyed what he *actually said* to Murphy-Aguilu. Defendant does not now claim that the attorney-client privilege applies to a communication that he never made.

¶ 53      Finally, defendant's posttrial motion shows not merely forfeiture but the pursuit of a theory that depended on his decision to invite the alleged error. The motion did not contend that the court had violated the attorney-client privilege. Indeed, it ridiculed the very idea that the privilege applied, arguing that Murphy-Aguilu had "bizarrely" believed that it did. Instead of contending that the court had given the State too much latitude in questioning Murphy-Aguilu, it contended that the court had given *him* too *little*.

¶ 54      In sum, we hold that defendant's present claim of error is foreclosed by both forfeiture and the invited-error doctrine. In the interests of justice and sound doctrine, however, we proceed to the merits of the claim of error. For the following reasons, we hold that there was no violation of the privilege and that the alleged error was in any event harmless.

¶ 55      We turn first to whether the attorney-client privilege was violated. When legal advice of any kind is sought from a professional legal adviser in his capacity as such, the communications relating to that purpose, made in confidence by the client, are at his instance permanently protected from disclosure unless the client waives the privilege. *People v. Radojcic*, 2013 IL 114197, ¶ 40. The privilege belongs to the client and cannot be waived by the attorney (*id.* ¶ 39) but can embrace communications by the attorney to the client as well as vice versa (*id.* ¶ 40). The purpose of the privilege is to encourage full and frank communications between attorneys and clients without the fear that confidential information will be disseminated. *Id.* ¶ 39. Because the privilege prevents otherwise relevant and admissible evidence from being disclosed, it must be confined within its narrowest possible limits. *Id.* ¶ 41. As no pertinent facts are disputed here, our review is *de novo*. See *id.* ¶ 35.

¶ 56      The parking-lot statement does not meet the criteria for the privilege. First, it cannot be said that legal advice was being sought. Defendant did not initiate the call; Murphy-Aguilu did. Murphy-Aguilu did not offer legal advice or discuss trial strategy; he merely asked defendant where he was when he should have been in court. In response, defendant did not seek legal advice: he told Murphy-Aguilu that he was in the parking lot. Although defendant sought legal advice from Murphy-Aguilu on many prior occasions, he did not do so on the morning of August 25, 2015.

¶ 57      Second, it cannot be said that what defendant told Murphy-Aguilu was confidential. Murphy-Aguilu called defendant from court, with the judge, jury, and prosecutor present and awaiting the start of trial. He asked where defendant was, obviously hoping that he would show up or fearing that he would be unable to make it. Defendant could not reasonably expect that what he told Murphy-Aguilu would remain a secret between them.

¶ 58      We also clarify that whether the statement was within the privilege was determined when it was made. To the extent that defendant is arguing that the statement was not privileged when it was made, but somehow became privileged in the context of the present prosecution, the argument fails. Thus, we conclude that introducing the parking-lot statement did not violate the attorney-client privilege.

¶ 59      We hold next that any error was harmless. There is no reason to think that the recitation of the parking-lot statement, even if improper, affected the result of the trial. (This is even aside from the fact that the jury's note to the court suggests that it had the potential to affect the result in defendant's *favor*.) The sole disputed issue at trial was whether defendant's absence for the requisite period had been willful. There was no dispute, however, that, at a previous hearing, defendant was told plainly that his trial would be held on August 25, 2015; that he signed a

bail-bond form telling him so;[2] that he posted bond; that, after August 25, 2015, he never appeared in court or, as far as the record shows, attempted to get in touch with the court or Murphy-Aguilu; that he moved out of his grandmother's residence without disclosing his new residence to her; and that, several months after his bond was forfeited, he was discovered in Chicago, where he was served with a warrant for his nonappearance in case No. 12-CF-2466 and other cases as well. Also, when Hall twice called what he had been told was defendant's number, he received no reply or an evasive one. The evidence of willfulness was extremely strong, and the nondisclosure of the parking-lot statement would not have negated it.

¶ 60                              III. CONCLUSION
¶ 61          The judgment of the circuit court of Du Page County is affirmed.

¶ 62          Affirmed.

---

[2]Defendant argues that the bail-bond slips should not be considered, because they were hearsay. However, the trial court did admit them into evidence, and there is no reason that we may not consider them in assessing the strength of the State's case.