NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2026 IL App (4th) 250948-U

NO. 4-25-0948

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
January 26, 2026
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* M.B., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Winnebago County |
| Petitioner-Appellee, | ) | No. 25JA101 |
| v. | ) | |
| Julia B., | ) | Honorable |
| Respondent-Appellant). | ) | Erin B. Buhl, |
| | ) | Judge Presiding. |

JUSTICE DeARMOND delivered the judgment of the court.
Justices Knecht and Harris concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The appellate court affirmed, finding (1) respondent did not receive ineffective assistance when counsel did not challenge the default judgment entered against her at the initial shelter care hearing and (2) under the doctrine of invited error, respondent is estopped from challenging the court's neglect finding.

¶ 2    In April 2025, the State filed a petition alleging M.B., the minor child of respondent mother, Julia B., was neglected under section 2-3(1)(b) of the Juvenile Court Act of 1987 (Juvenile Act) (705 ILCS 5/2-3(1)(b) (West 2024)). During the initial shelter care hearing, the trial court entered a default judgment against Julia for failing to appear and granted M.B.'s temporary custody and guardianship to the Illinois Department of Children and Family Services (DCFS). At the subsequent adjudicatory hearing, Julia stipulated M.B. was neglected and requested the matter proceed to a dispositional hearing. During the dispositional hearing, Julia asked the court to grant M.B.'s custody to Johnathan D., M.B.'s father. The court made M.B. a

ward of the court to allow Johnathan to file a separate family case to obtain custody of M.B.

¶ 3        Julia appeals, arguing (1) counsel provided ineffective assistance by not challenging the default judgment entered against her at the initial shelter care hearing and (2) she did not voluntarily stipulate that M.B. was neglected because (a) the trial court did not make sufficient factual findings on the record pursuant to section 2-21(1) of the Juvenile Act (705 ILCS 405/2-21(1) (West 2024)) and (b) the State did not present a sufficient factual basis to support the stipulation. The State argues counsel was not ineffective and the invited error doctrine precludes Julia from challenging the court's neglect finding. We affirm.

¶ 4                                  I. BACKGROUND

¶ 5                                A. Initial Proceedings

¶ 6        On April 1, 2025, the State filed a petition alleging M.B. was a neglected minor whose environment was injurious to his welfare under section 2-3(1)(b) of the Juvenile Act (705 ILCS 405/2-3(1)(b) (West 2024)).

¶ 7        According to a statement of facts prepared by DCFS, M.B. was born on March 27, 2025. Julia was homeless and suffered from mental health issues. Julia was "combative with staff throughout labor," and she did not want hospital staff to monitor M.B. While in the hospital, Julia "threatened to hit staff members," used profanity toward them, and called the police on them. Hospital staff suspected Julia might have intentionally broken her water, as they observed vaginal bleeding upon Julia's return to the hospital after a day of nonactive labor, and Julia asserted that "she should have terminated the pregnancy." DCFS took custody of M.B. the following day.

¶ 8        Before DCFS took custody of M.B., Latrachia Russey, a DCFS investigator, attempted to speak with Julia regarding the agency's concerns about M.B. Julia became

combative and refused to cooperate. Russey called the public service administrator (PSA), who tried to speak with Julia, but "Julia was combative and erratic in her behavior and told [the] PSA that she was not going to cooperate." The PSA decided M.B. should be placed in protective custody. In response, Julia "began to swear," grabbed the bassinet, and picked M.B. up, refusing to relinquish him to the nursing staff. Julia proceeded to call 911, all the while remaining "verbally abusive" toward Russey and the hospital staff. When police arrived in response to Julia's 911 call, she still would not release M.B. As a result, hospital staff "made the decision to restrain her and take [M.B.]," who was placed in the nursery. The hospital staff planned to move Julia to a medical room, but Julia "decided she would discharge." Hospital security escorted Julia out of the building, and a "No Trespass" notice was issued against her.

¶ 9        Russey subsequently filed a document alleging it was "a matter of urgent and immediate necessity" that DCFS receive temporary guardianship and custody of M.B. because, in addition to Julia's "untreated metal health diagnoses that impair her ability to make parental decisions in the best interest of the child," she also "did not satisfactorily complete services and her parental rights were terminated for her oldest child in 2021."

¶ 10                                B. Shelter Care Hearings

¶ 11        On April 1, 2025, the trial court conducted a shelter care hearing, which Julia did not attend. Russey testified regarding her interaction with Julia in the hospital. Russey testified she informed Julia of the hearing's date and time, and she gave Julia the courtroom number and the courthouse's address. Julia did not give Russey her contact information. Julia did not have a permanent address, but she informed hospital staff she would be staying at a hotel. However, when officers were dispatched to the hotel to respond to threats Julia made against the hospital, she was not there. At the hearing's conclusion, the trial court defaulted Julia "for shelter care

purposes only," finding she received notice of the hearing but failed to attend. After considering the statement of facts and Russey's testimony, the court found, "[T]here is probable cause to believe [M.B.] is neglected as alleged in the petition." The court found it was "a matter of urgent and immediate necessity" to grant M.B.'s temporary custody to DCFS, and it did so. The court then continued the matter until April 7, 2025.

¶ 12    Julia attended the subsequent shelter care hearing on April 7, 2025, along with M.B.'s father, Johnathan. The trial court admonished both regarding their respective rights in this case. After a recess, during which appointed counsel conferred with Julia, counsel presented an agreement for the court's approval. According to the agreement, *inter alia*, Julia and Johnathan would waive their respective rights to a shelter care hearing, stipulate probable cause existed showing M.B. was neglected, and consent to M.B.'s guardianship and custody remaining with DCFS, which would have discretion regarding visitation. As counsel presented the agreement's terms, Julia raised her hand. When the court acknowledged her, she said, "Yes, [Y]our Honor. I didn't agree to waive my right to a shelter care hearing." The court replied, "I defaulted you on April 1st. I found at that time through testimony that you had been provided the information for court. And I defaulted you at that point because you failed to attend either in person or via Zoom." The court confirmed with Julia and Johnathan that counsel accurately presented the terms of the agreement and gave them an opportunity to ask questions. The court accepted the agreement and ordered that M.B.'s temporary custody would remain with DCFS. When asked at the conclusion of the hearing whether she had any questions about the orders just entered, Julie replied, "No, [Y]our Honor."

¶ 13    C. Amended Neglect Petition and Services Reports

¶ 14    On April 17, 2025, the State filed an amended neglect petition, which alleged

- 4 -

M.B.'s environment was injurious to his welfare because Julia "has mental health issue[s] that prevent her from properly parenting, thereby placing [M.B.] at risk of harm," and Julia "failed to cure the conditions that brought [M.B.'s] sibling into care." The petition asserted it was in M.B.'s best interest to be adjudged a ward of the court.

¶ 15 On June 27, 2025, Lutheran Social Services of Illinois (LSSI) filed a report recommending M.B.'s guardianship and custody be restored to Johnathan. The report alleged Julia "was diagnosed with generalized anxiety disorder—moderate, depression—moderate functioning impairment/distress interpersonally." Julia also self-reported that she suffered from posttraumatic stress disorder. She was not prescribed any medication, and she had biweekly phone sessions with her counselor. Julia said she was willing to participate in parenting education, but she had not signed the necessary releases to facilitate a referral.

¶ 16 On August 1, 2025, LSSI filed another report, which stated Julia was currently incarcerated. Before she was arrested, Julia was homeless and claimed to be "bouncing between friends' homes." According to the report, a housing referral had been submitted on Julia's behalf on April 24, 2025, to assist her with finding appropriate housing and employment. When the housing worker reached out, Julia denied assistance, and the referral was closed. According to the report, Julia believed cooperating with the housing worker would be " 'pointless' " if the worker could not find housing for her " 'right away.' " Julia contacted the housing worker in June 2025, and the worker submitted another referral on June 13, 2025. However, Julia subsequently "denied working with the housing assistance again," claiming it was not what she needed.

¶ 17 Julia failed to participate in an integrated assessment interview. After attending two meetings with her caseworker, she began refusing to meet with her caseworker without her

- 5 -

attorney present. However, when the caseworker arrived at the jail to meet with Julia in July, "Julia saw the worker and turned around saying, 'oh fuck no' and told the officer she [was] refusing to meet with the worker." Julia was scheduled to complete four drug tests from May 2025 through July 2025, but she did not appear for any of them.

¶ 18          Johnathan obtained an order of protection against Julia on July 3, 2025, based on her behavior, which included stalking, harassing, and sending death threats to him via text messages and social media. The report asserted that, "[o]n numerous occasions, Julia has made open threats to kill [Johnathan] and his family" and she "broke the order of protection by continuing to make death threats" toward Johnathan, which resulted in her arrest on July 10, 2025.

¶ 19          According to the report, Johnathan had stable housing and employment, completed all the required assessments with no follow-up recommendations, and possessed all necessary items for M.B., including diapers, wipes, formula, clothes, a changing table, and a bassinet. The report recommended the trial court find Johnathan to be a fit and proper parent, cancel DCFS's guardianship of M.B., and restore M.B.'s custody to Johnathan.

¶ 20                              D. Adjudicatory Hearing

¶ 21          On August 11, 2025, the trial court conducted an adjudicatory hearing. The State presented an agreement for the court to approve. According to the agreement, *inter alia*, Julia would stipulate she failed to cure the conditions that brought M.B.'s older sibling into the care of DCFS and the State would dismiss the other count "pursuant to the agreement that services are to be completed." The State specified, "[T]he factual basis for that stipulation is the original statement of facts." According to the State, Julia "was hoping we can also move to disposition *instanter*." The court clarified the following:

"[W]hat I'm being told is that, [Julia], you're agreeing to stipulate to Count 2. Count 2 alleges that this child is neglected, under the age of 18, that his environment is injurious to his welfare. It alleges that you have failed to cure the conditions that brought the child's sibling into care[,] placing this child at risk of harm. I'm told that Count 1 would be dismissed, and that [Johnathan], you have no objection to that stipulation."

The court advised Julia and Johnathan of the rights they were giving up and accepted the agreement as voluntarily made.

¶ 22                          E. Dispositional Hearing

¶ 23          The matter proceeded to a dispositional hearing, during which Julia testified she wanted M.B.'s custody to be placed with Johnathan "effective immediately," but she wanted M.B.'s guardianship "to remain with DCFS while services are being done." Julia desired "an opportunity to complete services." Julia testified a two-year order of protection had been entered between herself and Johnathan, and as a result, she requested the trial court require visits to be supervised by DCFS "and that [Johnathan] is not the one coordinating the visitation." Julia believed Johnathan would leave the state with M.B., and Julia asked the court to prevent him from doing so without the court's permission. Julia testified Johnathan lived with the mother of his first child, and Julia demanded M.B. not be left with her when Johnathan traveled for work.

¶ 24          Julia also requested M.B.'s case be handled by a different agency closer to Johnathan and because she could not "get along" with the current case manager. Julia insisted "the current case manager has done nothing to help" resolve her housing situation, which contributed to M.B.'s removal from her care. However, Julia acknowledged the case manager referred her to a housing support organization, but Julia claimed, "That is not stuff I need. What I

need is a referral to HUD Housing, Rockford Housing Authority."

¶ 25        The trial court found Julia unfit or unable to care for M.B. It found Johnathan fit, willing, and able to care for M.B., and it restored M.B.'s guardianship and custody to him. The court ordered that Julia receive supervised visitation facilitated through DCFS. The court opined, "[Julia] is in the county jail currently. She is not in a position to care for this child. I have significant concerns about her mental health. I think she needs counseling[ and] further mental health services." The court did not restrict Johnathan's ability to travel with M.B., and it gave him discretion regarding who might care for M.B. while he was working, finding "he has made wise decision about the care of his son, and I have no reason to limit his ability to make those decisions." M.B. was made a ward of the court "to allow for [Johnathan] to file a case in family court."

¶ 26        This appeal followed.

¶ 27                                II. ANALYSIS

¶ 28        On appeal, Julia argues (1) appointed counsel provided ineffective assistance by not asking the trial court to set aside the default judgment entered against her and (2) she did not voluntarily stipulate that M.B. was neglected because (a) the court did not make sufficient factual findings on the record pursuant to section 2-21(1) of the Juvenile Act (705 ILCS 405/2-21(1) (West 2024)) and (b) the State did not present a sufficient factual basis supporting the stipulation.

¶ 29                            A. Ineffective Assistance

¶ 30        To prevail on her ineffective assistance of counsel claim, Julia must satisfy the familiar two-pronged test articulated in *Strickland v. Washington*, 466 U.S. 668 (1984). *In re D.F.*, 2025 IL App (1st) 240914, ¶ 104. She must show (1) counsel's actions "constituted errors so serious as to fall below an objective standard of reasonableness" and (2) but for those errors,

"there was a reasonable probability that the outcome of the proceeding would have been different." *D.F.*, 2025 IL App (1st) 240914, ¶ 104. Specifically, Julia must prove counsel's performance "fell below an objective standard of reasonableness, as measured against prevailing professional norms." *D.F.*, 2025 IL App (1st) 240914, ¶ 105. Further, "a reasonable probability that the result would have been different is a probability sufficient to undermine confidence in the outcome—or put another way, that counsel's deficient performance rendered the result *** unreliable or fundamentally unfair." *People v. Evans*, 209 Ill. 2d 194, 220 (2004). Julia must satisfy both prongs of the *Strickland* test; "if one of the two prongs is missing, we need not consider the other one." *D.F.*, 2025 IL App (1st) 240914, ¶ 106.

¶ 31        Julia insists counsel should have moved to vacate the default judgment entered against her when she failed to appear at the initial shelter care hearing on April 1, 2025, and counsel's failure to do so constituted deficient performance. Julia further argues she suffered prejudice because she was deprived of the opportunity "to present evidence and cross[-]examine [the] State's sole witness that testified at the hearing."

¶ 32        Under section 2-9 of the Juvenile Act, a minor taken into temporary custody "must be brought before a judicial officer within 48 hours *** for a temporary custody hearing." 705 ILCS 405/2-9(1) (West 2024). "[T]he minor's parents *** have the right to be present, to be heard, to present evidence material to the proceedings, to cross-examine witnesses, to examine pertinent court files and records and also *** the right to be represented by counsel." 705 ILCS 405/1-5(1) (West 2024). The State must "ensure notification to the minor's parent *** of the time and place of the hearing by the best practicable notice, allowing for oral notice in place of written notice only if provision of written notice is unreasonable under the circumstances." 705 ILCS 405/2-9(2) (West 2024). If a party could not be served prior to the temporary custody

hearing and did not appear, the hearing may go forward on an *ex parte* basis. 705 ILCS 405/2-10(3) (West 2024). However, a parent who was not present during such a hearing and did not receive adequate notice has the right to request a full rehearing. 705 ILCS 405/2-10(3) (West 2024).

¶ 33        The record shows Russey gave Julia oral notice of the hearing when they spoke on March 28, 2025. When this interaction took place, Julia did not have a permanent address, and she refused to tell Russey where she would be staying. Russey had no additional contact or communication with Julia between their conversation on March 28, 2025, and the initial shelter care hearing on April 1, 2025. While Russey eventually learned the name of a hotel in which Julia might have been staying, officers dispatched to her hotel room did not find her there on the day before the initial shelter care hearing. There is sufficient evidence in this record to find the provision of written notice was "unreasonable under the circumstances" because Julia could not be located within the time frame for a shelter care hearing. 705 ILCS 405/2-9(2) (West 2024). As a result, the oral notice Julia received was "the best practicable notice" and sufficient to satisfy the requirements of section 2-9(2) (705 ILCS 405/2-9(2) (West 2024)). Thus, Julia's claim that counsel's representation was deficient for failing to seek a rehearing under section 2-10(3) fails because any allegation that she did not receive adequate notice of the shelter care hearing conducted *ex parte* would lack merit. See 705 ILCS 405/2-10(3) (West 2024). The record demonstrates Julia received "the best practicable notice" and a motion for rehearing would be futile. See 705 ILCS 405/2-9(2) (West 2024). Counsel's performance was not objectively unreasonable under the prevailing professional norms, as counsel is not required to file futile motions to provide effective assistance. See *People v. Muhammad*, 257 Ill. App. 3d 359, 367 (1993). Because we find counsel did not provide deficient performance, we need not address

- 10 -

whether Julia suffered prejudice. See *D.F.*, 2025 IL App (1st) 240914, ¶ 106.

¶ 34                                    B. Neglect Stipulation

¶ 35         Julia also asserts the trial court's adjudicatory order should be reversed because her stipulation was not voluntary. Specifically, she argues (1) the court did not make sufficient factual findings to comply with section 2-21(1) of the Juvenile Act (705 ILCS 405/2-21(1) (West 2024)) and (2) the State did not present a sufficient factual basis supporting her stipulation. The State argues Julia invited any error that might have occurred because she actively participated in the direction of the proceedings. We agree with the State and affirm the court's judgment.

¶ 36         Under the invited error doctrine, a party "may not ask the trial court to proceed in a certain manner and then contend in a court of review that the order which he obtained was in error." *People v. Lowe*, 153 Ill. 2d 195, 199 (1992). "The invited-error doctrine applies when a [party] claims error *** but deliberately acquiesced in the alleged error." *People v. Holloway*, 2019 IL App (2d) 170551, ¶ 45. "Our supreme court has viewed cases of acquiescence strictly, finding that a party's active participation in the direction of proceedings *** goes beyond mere waiver such that the traditional exceptions to the waiver rule do not apply." (Internal quotation marks omitted.) *People v. Moore*, 2021 IL App (2d) 200407, ¶ 36. "A party is estopped from taking a position on appeal that is inconsistent with a position the party took in the trial court." *In re Stephen K.*, 373 Ill. App. 3d 7, 25 (2007). "Thus, invited error does not raise a mere forfeiture to which the plain-error exception might apply; it creates an estoppel that precludes plain-error analysis." *Holloway*, 2019 IL App (2d) 170551, ¶ 44.

¶ 37         We find instructive our decision in *In re R.W.*, 2025 IL App (4th) 241614-U, ¶ 5, where the respondent stipulated to the State's neglect allegation. The matter proceeded to a dispositional hearing, after which the trial court found the respondent unfit and unable. *R.W.*,

2025 IL App (4th) 241614-U, ¶ 6. On appeal, we granted appellate counsel's motion to withdraw and affirmed the trial court's judgment, finding, in pertinent part, "the record shows that any argument challenging the trial court's finding of neglect would be barred by the doctrine of invited error because respondent agreed to stipulate to the allegations in the State's petition." *R.W.*, 2025 IL App (4th) 241614-U, ¶ 14. The same is true here. At the adjudicatory hearing, Julia stipulated M.B. was neglected because she failed to correct the conditions resulting in the removal of M.B.'s sibling from her care. Julia wished for the matter to proceed directly to a dispositional hearing, and the trial court obliged. As was the case in *R.W.*, the invited error doctrine bars any argument challenging the court's neglect finding during the adjudicatory hearing because Julia stipulated to count II of the State's neglect petition. See *R.W.*, 2025 IL App (4th) 241614-U, ¶ 14. Therefore, Julia is estopped from challenging the court's neglect finding. See *Stephen K.*, 373 Ill. App. 3d at 25; *Holloway*, 2019 IL App (2d) 170551, ¶ 44.

¶ 38                              III. CONCLUSION

¶ 39            For the reasons stated, we affirm the trial court's judgment.

¶ 40            Affirmed.