NOTICE

Decision filed 04/24/23. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2023 IL App (5th) 200401-U

NO. 5-20-0401

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Franklin County. |
| | ) | |
| v. | ) | No. 19-CF-459 |
| | ) | |
| BRADLEY J. BRADEN, | ) | Honorable |
| | ) | Eric J. Dirnbeck, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE CATES delivered the judgment of the court.
Justices Vaughan and McHaney concurred in the judgment.

**ORDER**

¶ 1    *Held*:  We affirm the defendant's residential burglary conviction where trial counsel's failure to object to an unsolicited statement made by the codefendant, 911 phone calls, and hearsay evidence did not amount to ineffective assistance of counsel or plain error. Cumulative error was not found.

¶ 2    The defendant, Bradley Braden, appeals his conviction of residential burglary after a jury trial. The defendant seeks a new trial and argues that his codefendant made a prejudicial statement in front of the jury, unduly prejudicial 911 phone calls were published to the jury, and hearsay testimony was improperly admitted. He additionally argues that a new trial should be granted based on cumulative error. For the following reasons, we affirm the judgment of the conviction.

¶ 3                              I. BACKGROUND

¶ 4    On October 30, 2019, the defendant was arrested and subsequently charged for the offense of residential burglary in violation of section 19-3 of the Criminal Code of 2012 (Code) (720 ILCS

1

5/19-3(a) (West 2018)). The charges included that the defendant acted in concert with Miriam Espinosa-Jimenez and he entered the residence of Barbara Androvandi with the intent to commit theft. Miriam entered into a guilty plea and was not jointly tried with the defendant.

¶ 5    The State filed a motion *in limine* on February 6, 2020, requesting the admission of the defendant's prior convictions for impeachment purposes if the defendant testified. The State asserted in its motion that the defendant was convicted of burglary in *People v. Braden*, No. 12-CF-317 (Cir. Ct. Franklin County, Nov. 5, 2012) and of residential burglary in *People v. Braden*, No. 08-CF-308 (Cir. Ct. Franklin County, Mar. 19, 2009). The State additionally filed a motion *in limine* to rule on the admissibility of a telephone call made by the defendant from jail to his brother. The defendant did not object to the admissibility of the telephone call.

¶ 6    The defendant moved to exclude evidence of other crimes mentioned during his interview with the Franklin County Sheriff's Office. Twelve instances of prior and pending criminal activity, both charged and uncharged, were referred to during the defendant's recorded statement. The defendant requested that the State redact the recorded statement to remove references to the defendant's involvement in other crimes. The State filed a response and agreed to redact nine instances on the interview tape and objected to redacting further parts of the video. The parties reached an agreement on the redaction of the video.

¶ 7    The jury trial began on March 4, 2020. After jury selection and opening statements, the State called Jared Diuguid as its first witness. Diuguid was a dispatcher at the Franklin County Sheriff's Office. He testified to 911 calls with Barbara Androvandi on October 30, 2019, that began at 1:50 p.m. The 911 calls, which were approximately 19 minutes in total duration, were admitted into evidence without objection and published for the jury.

¶ 8     During the initial 911 call, Androvandi told the dispatcher that she caught someone inside her house. A woman had been waiting for the intruder in a black Chrysler Pacifica. Androvandi provided her address when she requested police assistance. She stated that the person was running from her house across a field. The call then disconnected.

¶ 9     Diuguid called Androvandi back. He asked her to remain on the line, and informed Androvandi that deputies were on their way. Androvandi updated Diuguid on the intruder's location. He was in a field near Grammer Road. Androvandi then stated that she saw the woman's Chrysler Pacifica and that the man had flagged down the vehicle. After the man entered the vehicle, they headed north on Lincoln Road out of Androvandi's sight. Androvandi offered to follow them in her car and was told not to do so by the dispatcher.

¶ 10     Androvandi described the woman as Mexican with long brown hair. Androvandi could not describe the man. She explained that she did not see his face because he was wearing a gray or black hoodie, and black pants. Androvandi stated that "it all happened so fast." Then she explained that his clothes should be wet because she had sprayed him with wasp spray.

¶ 11     Androvandi told the dispatcher that she had two little grandkids that were "scared to death." Androvandi spoke to her grandchildren and said, "come on boys, get in the house." While on the call she had directed her grandchildren to get away from something. Androvandi informed the dispatcher no one was in the house when the intruder entered and that they had just arrived back at their house.

¶ 12     Androvandi additionally informed the dispatcher that she had noticed that a screen was removed from her kitchen window which alerted her that something was wrong. When Androvandi entered her home, the intruder was in her bedroom. She saw him with a box, and she sprayed him with wasp spray as he headed out the front door.

3

¶ 13    While on the phone with the 911 dispatcher, Androvandi went into her bedroom and exclaimed "oh gosh, he tore up my house. My bedroom, oh lord." At first, she claimed that he had taken cash, jewelry, and that he had dropped a safe.

¶ 14    Androvandi was informed by the dispatcher that the suspects had been pulled over. She responded, "wonderful, get my jewelry back, and my money." The dispatcher advised Androvandi to refrain from going through her personal belongings. She was also asked to describe what was taken. Androvandi responded that she could not describe what was missing because she would have to go through her jewelry box. She stated that her belongings had been piled on top of her bed. She noticed that that the intruder had damaged her dresser drawers and she believed envelopes of money were missing. Androvandi additionally told the dispatcher about a wedding ring valued at about $5000 that could have been taken. Then she saw the ring and stated that she must have "just caught him." Androvandi then found the money envelopes and verified that the money was still in them. She again stated that she must have "just caught him in the act." Androvandi believed that the intruder had not taken anything as she had interrupted him. The intruder had attempted to leave with a safe, but Androvandi did not keep anything in the safe. The 911 call ended when the police arrived at her house.

¶ 15    Barbara Androvandi also testified in court to the events that occurred on October 30, 2019. Androvandi testified that she had returned home with her four- and five-year-old grandsons to discover someone "robbing" her house. A black Chrysler Pacifica was parked in Androvandi's driveway that she did not recognize. Androvandi approached the vehicle, and a woman was sitting in the driver's seat. Androvandi asked the woman what she was doing, and the woman responded, in broken English, that she was waiting for "Jack." Androvandi told the woman that "Jack" did

4

not live there and asked her to leave. The woman left but "made a show of getting out of the driveway" by continuing to back up and pull forward before leaving.

¶ 16    Androvandi testified that her front kitchen window was open, and the screen had been removed. Androvandi entered her home through the garage. She grabbed a can of wasp spray, opened the door, and yelled "get out of my house now." A man dressed in athletic pants and a hoodie, which covered his head, ran from her bedroom down the hallway. The man ran by Androvandi towards the front door. Androvandi sprayed him with wasp spray as he went by, and she chased after him. She continued to spray his back and never saw his face. The man dropped the safe and left through the front door "screaming like a little girl."

¶ 17    Androvandi followed the man outside and called 911. Androvandi watched him as he ran to the east across a field. He stayed on the west side of the trees and did not go into the woods. Androvandi then saw the black Chrysler Pacifica on Lincoln Road. She watched the man as he ran between the trees waving his hands until he got into the vehicle.

¶ 18    Androvandi was shown a group of photographs of her home taken on October 30, 2019, which were marked as exhibits 8A through 8L, and admitted into evidence. The photographs depicted Androvandi's driveway, the kitchen window screen lying on the ground, Androvandi's front door, the garage and the door where Androvandi entered her home, the sub-hallway, a hallway with the safe on the ground, Androvandi's bedroom, and an additional photograph of the pile of items on Androvandi's bed.

¶ 19    Androvandi testified that a pair of earrings and two prescriptions were taken from her house without her permission. She did not give the defendant or Miriam permission to enter her home.

¶ 20    The State called Deputy Rex Roberts with the Franklin County Sheriff's Office as its next witness. On October 30, 2019, Roberts received a call about a residential burglary in progress and

5

he was dispatched to Androvandi's residence. Roberts was also informed that a black Chrysler Pacifica was involved and had left the residence. At 2:02 p.m., Roberts located and stopped the vehicle approximately three miles from Androvandi's residence. Roberts testified that Miriam Espinosa was driving the vehicle, and the defendant was a passenger.

¶ 21 Roberts could smell a chemical odor emitting from the vehicle during the stop. Roberts testified that he was able to recognize the smell as wasp spray because he had used wasp spray at his house the day before. On cross-examination, Roberts testified that the defendant did not have red eyes, his face was not red, and he did not ask for medical care or to clean his face. Roberts did not take a chemical swab of the defendant's face or of the defendant's clothing to determine whether the defendant had been sprayed with wasp spray.

¶ 22 The defendant had a conversation with Roberts and informed him of the defendant's whereabouts earlier in the day. Roberts investigated the defendant's statement. Roberts obtained video surveillance from Walmart, which confirmed that the defendant was at Walmart from 12:34 p.m. to 12:48 p.m. The surveillance video depicted the defendant wearing a dark shirt, a dark pair of pants, and a pair of black and white tennis shoes. Roberts additionally testified that he had located black Nike Air shoes along the roadside approximately two miles from where he stopped the defendant. Photographs of the shoes were admitted into evidence.

¶ 23 Deputy Roberts had also been told by the defendant that he had gone to Barbara Waterbury's house earlier that day. Roberts interviewed Waterbury and testified to their conversation. Roberts testified that Waterbury told him that

> "someone did come to her house earlier that day, honked the horn, driving a black car. She exited her residence, spoke with the driver, the male, and she advised that the male subject asked about a specific person, if someone was there, reporting that it was a 14-year-old boy. She said she did not recognize the name, and no one lived there by that name and so the car departed."

6

Waterbury also told Roberts that the driver was male, and the passenger was wearing a hood and may have been female, but she was uncertain. The defense made no objections during this portion of Roberts' testimony. During cross-examination, defense counsel questioned Roberts about his conversation with Waterbury. Defense counsel elicited testimony that Waterbury told Roberts that someone had honked their horn at her residence.

¶ 24    Roberts testified that the defendant denied going into Androvandi's house. The defendant claimed that Nick Lambert was the intruder. Roberts testified that while he was searching for the black Chrysler Pacifica, he did not see Nick and Nick was not in the vehicle during the stop. Roberts explained that he did not specifically search for Nick because the victim had reported a black vehicle with one male and one female passenger, which was located.

¶ 25    Lieutenant Kevin Roye with the Franklin County Sheriff's Office testified that he was present when the black Chrysler Pacifica was pulled over. Miriam was driving the car and the defendant was the passenger. The defendant had a chemical odor emitting from his person. The defendant wore a T-shirt, shorts, and no shoes. Roye testified that it was a cool rainy day, and the temperature was "probably in the 40s." Roye transported Miriam to the sheriff's department.

¶ 26    Jason Sigler, a Walmart employee, testified that a deputy with the Franklin County Sheriff's Office requested video surveillance from October 30, 2019. Sigler provided videos from the security cameras. The videos were admitted and published to the jury.

¶ 27    Richard Minton, the lieutenant over investigations in the Franklin County Sheriff's Office, also testified. Minton responded to the call that there was a residential burglary in progress. He first went to the traffic stop made by Roberts and then proceeded to Androvandi's house. Minton explained that when a suspect was located in close proximity, shortly after a crime occurred, the victim is taken to the suspects' location for a "showup." Minton took Androvandi for a showup to

7

determine whether she could identify the suspects. Androvandi was able to identify Miriam as the driver. She was not able to identify the defendant. The defendant was not wearing the same clothing and Barbara never saw the intruder's face.

¶ 28 On cross-examination, defense counsel questioned Minton on the follow-up investigation based on the defendant's statement to law enforcement. The defendant had stated that he went to Walmart, McDonald's, and then to Barbara Waterbury's house on Lincoln Road. Minton testified that it was confirmed that the defendant had stopped by Waterbury's house. Defense counsel questioned Minton about Waterbury's statement. Minton testified that the defendant had pulled into Waterbury's driveway, honked the horn, and asked for someone. Waterbury could not remember the name of the person that the defendant had used. After they left Waterbury's, they pulled into the driveway on Valier Patch Road and Androvandi came up to talk to Miriam. Defense counsel asked Minton whether everything that the defendant had told him that he chose to follow up on was true. Minton responded that not everything that the defendant said was true.

¶ 29 Daniel Glover, a crime scene investigator with the Illinois State Police, testified that he processed Androvandi's home for fingerprints. Glover did not find usable fingerprints. Glover located footwear evidence and photographed the footwear evidence found on the kitchen floor. A gelatin lifter to collect footwear imprints from the floor was used. Two gel lifts were taken from the crime scene.

¶ 30 Lindell Moore with the Illinois State Police Forensic Science Laboratory was qualified as an expert witness in forensic science. Moore performed the shoeprint analysis. He compared the pair of Nike Air shoes in evidence to the two gel lifts which were submitted to the laboratory. Moore explained that when performing his analysis, he would first look for similarities between the pattern on the sole of the shoe and the gel lifts. If there are similarities, then he would look for

8

individual characteristics of damage or "wear" on the shoe. Then, if there are differences in the individual characteristics, he would eliminate the shoe as having left the impression. If there were similarities, he would look further to determine whether there were enough individual markings that would leave a unique surface marking. A set number of specific characteristics was not needed for a positive identification.

¶ 31    Moore testified that the shoes recovered were slightly dirty but in an "almost new condition." The shoes matched the footprints in class characteristics. Moore was unable, however, to make identifications that were exclusive to these shoes. The shoes did not have sufficient individual characteristics that would make a unique surface marking. He found that the shoes "could not be identified or eliminated" as making the print without sufficient individual characteristics. The shoes could have left the impressions, or the impressions could have been left by another pair of Nike Air shoes that were the same size.

¶ 32    Miriam Espinosa-Jimenez testified with the assistance of a Spanish interpreter. Miriam had been in a dating relationship with the defendant for three years. During Miriam's testimony she stated, "I supported him for three years. He most of the time was in prison." The defense objected to Miriam's statement. The State requested to address the objection outside of the presence of the jury. The circuit court removed the jury to the jury room. Outside the presence of the jury, the circuit court then sustained the defense counsel's objection and stated that an instruction would be given for the jury to disregard that portion of Miriam's testimony. The defense then motioned for a mistrial because Miriam had informed the jury that the defendant had been in prison and the State had not provided an indication that they intended to elicit testimony of prior crimes evidence.

¶ 33    The State objected to a mistrial. The State argued that the witness was questioned on how she knew the defendant and the State had not elicited the response provided by the witness. The

9

State further argued that the jury was unaware of the prior crime referenced. The circuit court then asked the defense whether an admonition to the jury to disregard the testimony was worse than saying nothing. The defense requested that the circuit court should instruct the jury to disregard what Miriam had said, without quoting her statement.

¶ 34    Outside of the presence of the jury, the circuit court admonished Miriam through the interpreter. Miriam was told to refrain from making any reference to the defendant having been in prison or having previously committed any criminal offenses.

¶ 35    The jury was then called back into the courtroom. The circuit court informed the jury that the last objection had been sustained and stated that, "each and every one of you are directed, as I had indicated in my instructions, you are directed now to disregard the answer that had been given just prior to the objection."

¶ 36    Miriam resumed her testimony. She indicated that on October 30, 2019, she had fallen asleep in her black Chrysler Pacifica parked in a woman's driveway. The woman approached the vehicle and questioned Miriam. Miriam told her that she did not live there, and she had passed out in the car. Miriam then left without the defendant. While Miriam was driving, she saw the defendant behind the car waving his hands, and she pulled over. The defendant got into the car and told Miriam to drive. While they were driving, the defendant threw his clothes and his shoes out of the car window. Miriam stopped the car when the police pulled them over.

¶ 37    Miriam testified that Nick Lambert was not with them on October 30, 2019. She was only with the defendant and her dog on that day. Miriam was shown a photograph of the Nike Air shoes and she testified that they belonged to the defendant.

10

¶ 38    Miriam additionally testified that she was charged with the same offense as the defendant. She was not promised anything in exchange for her testimony or threatened. On cross-examination the following transpired between the defense counsel and Miriam:

> "Q. You want to see them again?
> A. I do want to see my children, but that has not happened.
> Q. But you want to see them?
> A. I'm strong. I'm a strong woman. And I take—whatever I need to take, I take.
> Q. And you're worried today that you could possibly be deported over this?
> A. It's okay. It's okay. If somebody come and deport me it's okay. Do you know why? Because I come here.
> MS. DINN [Defense Counsel]: No further questions.
> A. And I know I steal nothing from nobody. I work every day, and I wake up, when this guy never go for his job.
> MS. DINN: No further questions.
> THE COURT: All right. Okay.
> THE STATE: Nothing further.
> THE COURT: Okay. Thank you. You're free to leave, all right? Thank you."

Defense counsel did not object to Miriam's unsolicited statement and no further questions were asked of Miriam.

¶ 39    Amy Spotanski-Tipton testified that she worked at the Franklin County Sheriff's Office as a detective. Amy testified that she was able to listen to phone calls made by the defendant while he was in jail. The defendant had used a different inmate's PIN number to make a call, but she recognized the defendant's voice as the caller. The phone call was admitted and published to the jury. During the phone call, the caller asked the other person on the call to contact Miriam to give her information that she needed regarding Brad's story. The defendant's trial counsel was also identified by name during the phone call. The State rested after Amy's testimony.

¶ 40    Outside the presence of the jury, the circuit court allowed the defense to expand on issues regarding the defendant's prior objection related to Miriam's testimony of the defendant's prior incarceration. A motion for a directed verdict was made by the defense and denied by the circuit court. The defense did not present any witnesses or evidence. After the defense rested, jury

11

instructions were discussed and then closing arguments were presented. The jury returned a guilty verdict for residential burglary.

¶ 41    A motion for a new trial was filed on March 31, 2020, where the defense argued that the defendant was denied his right to a fair trial. The defense argued that a juror had made a statement about the defendant's previous incarceration; the State's witness, Miriam Espinosa-Jimenez, was emotional during her testimony and stated that the defendant "does nothing but goes to prison all the time"; and the State had failed to comply with a discovery request for the production of exculpatory evidence.

¶ 42    The State filed a response and claimed that the defendant received a fair trial. The State argued that the evidence was sufficient for a reasonable trier of fact to return a verdict of guilty against the defendant. The motion for a new trial was not heard prior to the sentencing hearing.

¶ 43    The defendant filed a *pro se* motion for ineffective assistance of counsel. In the defendant's motion, he complained that Miriam was emotional during cross-examination. The circuit court held an inquiry on the defendant's *pro se* motion pursuant to *People v. Krankel*, 102 Ill. 2d 181, 185 (1984). The defendant claimed that his trial counsel had not finished her cross-examination of Miriam due to Miriam's emotional outburst. Trial counsel explained that cross-examination was not interrupted. Miriam "began to get emotional again" after her testimony concluded. The circuit court found that the defendant did not provide sufficient information for the circuit court to find that his counsel provided ineffective assistance and the trial was not inherently unfair to the defendant.

¶ 44    On July 20, 2020, the circuit court held a sentencing hearing. The defendant was sentenced as a Class X offender to 22 years in the Illinois Department of Corrections with 3 years' mandatory supervised release. The defendant subsequently filed a motion to reconsider and reduce his prison

sentence and argued that the circuit court failed to properly consider or make any finding of mitigating factors at the sentencing hearing.

¶ 45    On November 25, 2020, the defendant's motions for a new trial and motion to reconsider and reduce his sentence were argued. The circuit court denied the defendant's motions. This appeal followed.

¶ 46                                II. ANALYSIS

¶ 47    On appeal, the defendant argues that he was deprived of his right to a fair trial because his codefendant made a prejudicial statement in front of the jury, unduly prejudicial 911 phone calls were published to the jury, and hearsay testimony was improperly admitted. The defendant additionally argues that cumulative error rendered the defendant's trial fundamentally unfair in violation of his due process rights.

¶ 48    Trial counsel did not preserve any of these issues for review. Ordinarily, a party must raise an issue at trial and in a written posttrial motion to preserve an issue for review and the failure to do so forfeits the issue on appeal. *People v. Burton*, 2015 IL App (1st) 131600, ¶ 16. The defendant, however, argues on appeal that trial counsel provided ineffective assistance for failing to address these issues, or in the alternative, that the defendant should be granted relief under the plain-error doctrine.

¶ 49    When determining whether a defendant was denied effective assistance of counsel, the defendant must demonstrate that counsel's performance was deficient where it fell below an objective standard of reasonableness, and the deficient performance prejudiced the defendant such that he was deprived of a fair trial. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). Both prongs of the *Strickland* test must be satisfied by the defendant for a finding of ineffectiveness.

13

*People v. Veach*, 2017 IL 120649, ¶ 30. Ineffective assistance of counsel claims are generally reviewed *de novo*. *People v. Gunn*, 2020 IL App (1st) 170542, ¶ 91.

¶ 50    To establish deficient performance, the defendant must demonstrate that his trial counsel's performance was "objectively unreasonable under prevailing professional norms." (Internal quotation marks omitted.) *Gunn*, 2020 IL App (1st) 170542, ¶ 94. "A defendant is entitled to competent, not perfect, representation, and mistakes in trial strategy or judgment will not, of themselves, render the representation ineffective." (Internal quotation marks omitted.) *People v. Bell*, 2021 IL App (1st) 190366, ¶ 63. The defendant must overcome a strong presumption that trial counsel's inaction was based on sound trial strategy. *People v. Perry*, 224 Ill. 2d 312, 341-42 (2007). Trial strategy includes decisions on "what matters to object to and when to object." (Internal quotation marks omitted.) *Perry*, 224 Ill. 2d at 344. The failure to object to testimony, therefore, may be a matter of sound trial strategy which does not necessarily establish deficient performance. *People v. Evans*, 209 Ill. 2d 194, 221 (2004).

¶ 51    When considering the second prong of the *Strickland* test, the defendant must demonstrate that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Gunn*, 2020 IL App (1st) 170542, ¶ 96. Where the evidence against the defendant is overwhelming, the reviewing court will not be persuaded that it is reasonably probable that a jury would have acquitted the defendant in the absence of counsel's alleged errors. *Gunn*, 2020 IL App (1st) 170542, ¶ 96. A court may dispose of an ineffective assistance of counsel claim for insufficient prejudice before reaching the deficiency of counsel's performance. *People v. Pecoraro*, 144 Ill. 2d 1, 13 (1991).

¶ 52    The plain-error doctrine is applicable when a clear or obvious error occurred and (1) the evidence is so closely balanced that the error alone threatened to tip the scales of justice against

14

the defendant or (2) the error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process. *People v. Schoonover*, 2021 IL 124832, ¶ 27. "Plain error is construed as a narrow and limited exception to the typical forfeiture rule applicable to unpreserved claims." *Burton*, 2015 IL App (1st) 131600, ¶ 16.

¶ 53     The defendant argues that the first prong of plain error applies to each of the evidentiary issues raised on appeal and both prongs apply to the hearsay issue, which was the Rex Roberts-Waterbury conversation. When addressing the defendant's plain error argument, we must first determine whether error occurred at all. *Burton*, 2015 IL App (1st) 131600, ¶ 17.

¶ 54                    A. Statement Made by Miriam Espinosa-Jimenez

¶ 55     We first consider whether defense counsel was ineffective for failing to object and failing to seek jury instructions to disregard a statement made by Miriam Espinosa-Jimenez. The statement at issue is: "I know I steal nothing from nobody. I work every day, and I wake up, when this guy never go for his job." The defendant contends that this statement was inadmissible because it was unduly prejudicial and implied that the defendant was a thief.

¶ 56     Generally, the erroneous admission of evidence of other crimes ordinarily calls for reversal due to the high risk of prejudice. *People v. Lindgren*, 79 Ill. 2d 129, 140 (1980). Evidence of other crimes "overpersuades a jury" and a jury could convict the defendant based on the impression that the defendant is a bad person who deserves punishment. *People v. Moore*, 2012 IL App (1st) 100857, ¶ 46. Where the defendant has not been prejudiced or denied a fair trial by the admission of the evidence, it is not reversible error. *Evans*, 209 Ill. 2d at 220.

¶ 57     A reviewing court will consider counsel's performance from their perspective at the time of the trial, rather than in hindsight, and the reviewing court will be highly deferential to trial counsel on matters of trial strategy. *Perry*, 224 Ill. 2d at 344. A trier of fact cannot unhear a motion

15

to strike which may call attention to objectionable testimony. *Gunn*, 2020 IL App (1st) 170542, ¶ 118.

¶ 58    Our review of the entire record establishes that trial counsel provided effective assistance. During Miriam's direct examination, she stated, "I supported him for three years. He most of the time was in prison." Defense counsel immediately objected after this statement was made and the circuit court removed the jury from the courtroom. The circuit court questioned defense counsel on whether an admonition to the jury to disregard the testimony would be worse than saying nothing at all. An interpreter was present during Miriam's testimony because she had difficulty understanding English. The circuit court admonished Miriam through the interpreter to refrain from making any reference to the defendant's criminal offenses. Defense counsel requested that the jury be instructed to disregard Miriam's last statement without highlighting that Miriam testified that the defendant was previously incarcerated. The jury was admonished to disregard Miriam's statement.

¶ 59    The defendant, on appeal, takes issue with a second unsolicited statement by Miriam. During cross-examination Miriam was questioned about being deported and never seeing her children again. In response to that line of questioning, she stated, "I know I steal nothing from nobody." Miriam then continued to say, "I work every day, and I wake up, when this guy never go for his job." The defendant construes Miriam's statement to demonstrate that the defendant had a propensity to commit crimes. Miriam, however, was referring to herself and did not directly state that the defendant was a thief.

¶ 60    This issue was addressed during the *Krankel* hearing. Defense counsel explained that she had finished her cross-examination when the witness began to get emotional. In this circumstance, it was reasonable for defense counsel to have chosen not to object or request an instruction to

16

disregard the statements which would have highlighted the objectionable testimony from an emotional witness. The defendant has not demonstrated deficient performance by trial counsel on this issue.

¶ 61     We next turn to the plain error analysis. We reiterate that the first prong of the plain-error doctrine allows review of unpreserved error when "clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007).

¶ 62     "In determining whether the evidence adduced at trial was close, a reviewing court must evaluate the totality of the evidence and conduct a qualitative, commonsense assessment of it within the context of the case." *People v. Sebby*, 2017 IL 119445, ¶ 53. For instance, a single eyewitness who had ample opportunity to observe the incident and provides a positive identification is sufficient to support a conviction. *Piatkowski*, 225 Ill. 2d 551 at 566.

¶ 63     The evidence here was not closely balanced. The defendant was charged with residential burglary in violation of section 19-3(a) of the Criminal Code of 2012, which states:

> "A person commits residential burglary when he or she knowingly and without authority enters or knowingly and without authority remains within the dwelling place of another, or any part thereof, with the intent to commit therein a felony or theft." 720 ILCS 5/19-3(a) (West 2018).

¶ 64     The jury heard testimony from the homeowner, Barbara Androvandi. Androvandi testified that she arrived home to find a woman sitting in a black Chrysler Pacifica parked in her driveway. She noticed that her kitchen window was open, and the screen was removed. When she entered her house, she found a man inside, without her permission. Androvandi sprayed the man's back with wasp spray. While he fled the home, he dropped a safe. Androvandi additionally testified that the intruder had taken prescription drugs and jewelry.

17

¶ 65    Although Androvandi did not see the man's face, evidence was presented that she called 911 as she watched him flee across a field. Androvandi watched the intruder flag down the driver of the black Chrysler Pacifica and the couple drove away. The vehicle was stopped by law enforcement while Androvandi remained on a 911 call which was approximately 19 minutes in total duration.

¶ 66    Miriam's testimony was consistent with Androvandi's testimony. Miriam admitted to being in Androvandi's driveway when Androvandi returned home. Miriam testified that the defendant had flagged down her vehicle after he left Androvandi's house. The defendant had thrown his clothing and shoes from the moving vehicle while she was driving. She additionally testified that no one besides the defendant had been in her vehicle that day.

¶ 67    Deputy Roberts and Lieutenant Roye both testified to smelling a chemical odor when the defendant was pulled over. The defendant was not wearing shoes during the stop. Black Nike Air shoes were later located by law enforcement along the roadside. A shoeprint impression was found in Barbara's home. The shoes found by law enforcement alongside the road were not excluded as making the shoeprint impression. The jury was additionally shown a Walmart surveillance video taken prior to the residential burglary and the defendant was wearing black shoes on the video.

¶ 68    The defendant did not present any evidence to contradict the State's evidence. When considering the totality of the circumstances presented, the evidence that the defendant had committed residential burglary was not closely balanced. The remark by Miriam did not threaten to tip the scales of justice against the defendant. We reject the defendant's plain-error claim on this issue.

B. 911 Calls

¶ 70    The defendant also claims that the 911 calls published to the jury contained numerous prejudicial statements including that (1) Barbara repeatedly overstated the magnitude of the offense, (2) she arrived in time to stop the offender, (3) she had a conversation with her grandchildren while on the call, and (4) she made comments that the intruder made a big mess. The defendant claims that these statements should not have been admitted into evidence because they were irrelevant and only served to inflame the passions of the jury and garner sympathy for the victim. The circuit court's ruling will not be reversed unless there has been an abuse of discretion. *People v. Dominguez*, 382 Ill. App. 3d 757, 768 (2008).

¶ 71    Evidence is relevant when it has "any tendency to make the existence of any fact that is of consequence to the determination of an action either more or less probable than it would be without the evidence." *People v. Morgan*, 197 Ill. 2d 404, 455-56 (2001). If the evidence is remote, uncertain, or speculative, a circuit court may deny the admission of evidence on the grounds of relevancy. *Morgan*, 197 Ill. 2d at 456. Prejudice is "an undue tendency to suggest decision on an improper basis, commonly an emotional one, such as sympathy, hatred, contempt, or horror." (Internal quotation marks omitted.) *People v. Ward*, 2011 IL 108690, ¶ 41.

¶ 72    The 911 call was not remote in time. The 19-minute phone call began as Androvandi watched the intruder flee from her home. Within that time, law enforcement apprehended the suspects and arrived at Androvandi's house.

¶ 73    During the call, Androvandi responded to the dispatcher's inquiry of specific items that were missing. Androvandi had chased the intruder out of her house and called 911 from her front yard before discovering whether anything had been taken or damaged. Androvandi was on the 911 call when she first looked in her bedroom and noticed a pile of belongings on her bed. She initially

19

believed items such as jewelry and envelopes of cash were missing. Androvandi told the dispatcher that not much cash was in the envelopes and the intruder had dropped the safe, which was empty. Androvandi had stated that the intruder missed a $5000 wedding ring as she found the ring in her bedroom. Once Androvandi found the items that she believed were missing, she corrected herself and told the dispatcher that the intruder had not taken anything. Based on the foregoing, the defendant has not shown a reasonable probability that Androvandi's statements which she retracted would have swayed the passions of the jury and a different outcome would have resulted without the statements on the 911 call.

¶ 74    The defense argues that Androvandi's statements that the intruder had made a mess were improper. Those statements were cumulative of the admitted photographs of her home, which show items piled onto her bed and the safe dropped in the hallway. The jurors would not have misconstrued the statements about the mess made on the 911 tapes.

¶ 75    The defendant argues that the jury should not have heard Androvandi state that she may have just caught the intruder before he could have taken anything. This statement was cumulative of Androvandi's testimony and the evidence presented. Androvandi testified that she heard someone inside of her house, she entered through the garage, and chased the intruder with wasp spray. While doing so, the intruder dropped a safe and ran as he was "screaming like a little girl." Valuables were left in Androvandi's bedroom.

¶ 76    The defendant additionally argues that the jury should not have heard Androvandi speak to her young grandchildren on the tape. Androvandi's testimony included that her four- and five-year-old grandsons were with her when she returned home. Androvandi entered the home alone and she had clarified to the dispatcher that her grandchildren were not in the home when the

20

intruder was inside. Androvandi did not make any statements about the burglary to the children on the 911 call and the voices of the grandchildren in the background of the call were unintelligible.

¶ 77    As discussed above, the defendant did not object to the admission of the 911 call tapes and has not properly preserved this issue for review. The defendant argues that trial counsel was ineffective, and that the first prong of the plain error rule applies.

¶ 78    No prejudice occurred from the challenged Androvandi comments to the dispatcher because her statements on the 911 call were cumulative of her in court testimony and the photographic evidence. See *People v. Munson*, 171 Ill. 2d 158, 185 (1996) (the defendant was not prejudiced by admission of cumulative testimony as no different outcome would have resulted at trial absent her brief testimony). Additionally, a jury is presumed to have followed its instruction to not be influenced by sympathy or passion. *People v. Flores*, 2021 IL App (1st) 192219, ¶ 19.

¶ 79    The defendant cannot maintain an ineffective assistance claim where he cannot demonstrate prejudice. The evidence against the defendant was overwhelming and not closely balanced. The statements by Barbara on the 911 call did not threaten to tip the scales of justice against the defendant. We reject the defendant's plain-error claim on this issue.

¶ 80                                    C. Hearsay

¶ 81    The defendant contends that Rex Roberts' testimony about his conversation with Barbara Waterbury contained prejudicial hearsay and the introduction of this evidence violated the sixth amendment's confrontation clause. The defendant's claim involves a question of law, which is reviewed *de novo*. *People v. Williams*, 238 Ill. 2d 125, 141 (2010).

¶ 82    Hearsay is "an out-of-court statement offered to prove the truth of the matter asserted." *People v. Heard*, 187 Ill. 2d 36, 65 (1999). The sixth amendment's confrontation clause provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the

21

witnesses against him." (Internal quotation marks omitted.) *Crawford v. Washington*, 541 U.S. 36, 42 (2004). The confrontation clause does not apply to testimonial statements that were not offered to prove the truth of the matter asserted. *Williams*, 238 Ill. 2d at 142.

¶ 83    The defendant did not object to Roberts' testimony pertaining to his conversation with Waterbury. The trier of fact considers hearsay evidence when no objection is made, and without an objection, the issue is waived on appeal. *People v. Ramsey*, 205 Ill. 2d 287, 293 (2002). The defendant waived his challenge to the admission of Roberts' testimony by failing to object during trial and again asserts ineffective assistance of counsel or in the alternative, plain-error review.

¶ 84    The State argues that the invited-error doctrine bars the defendant from raising this evidentiary challenge. The invited-error doctrine applies where a defendant deliberately acquiesced in the alleged error as a matter of trial strategy. *People v. Holloway*, 2019 IL App (2d) 170551, ¶ 45. The invited error creates an estoppel which precludes plain-error analysis. *Holloway*, 2019 IL App (2d) 170551, ¶ 44. It would be unfair to the State to allow the defendant to use a ruling or action that the defendant secured at trial as a basis for a reversal on appeal. *Holloway*, 2019 IL App (2d) 170551, ¶ 44.

¶ 85    Not only did the defense refrain from objecting during the State's inquiry of Roberts, but the defense also elicited testimony from Roberts and Minton about statements made by Waterbury. Defense counsel attempted to demonstrate that the defendant was honest about the information that the defendant told law enforcement by confirming Waterbury's statements. The defense put forth a theory that the defendant had made truthful statements and Waterbury's identification of the defendant corroborated the defendant's statement to the police. The invited-error doctrine applies, and the defendant is precluded from plain-error review.

¶ 86 The defendant additionally failed to demonstrate that trial counsel's performance was deficient. It was reasonable for trial counsel to choose not to object to Roberts' testimony where the defendant was not contesting the testimony. The defendant had informed the police that he went to Waterbury's house and Roberts confirmed that the defendant's statement was true. Because defense counsel's trial strategy was reasonable, we need not proceed to the prejudice prong of *Strickland*. The defendant has not demonstrated ineffective assistance of counsel.

¶ 87                                D. Cumulative Error

¶ 88 A new trial may be granted based on the theory of cumulative error where the errors "create a pervasive pattern of unfair prejudice to the defendant's case." (Internal quotation marks omitted.) *People v. Green*, 2017 IL App (1st) 152513, ¶ 117. Generally, no cumulative error will be found where alleged errors do not amount to reversible error on any individual issue or where such errors did not rise to the level of plain error. *Green*, 2017 IL App (1st) 152513, ¶ 118. We rejected the defendant's claims of ineffective assistance of counsel, finding that counsel's performance was not deficient or did not result in prejudice under *Strickland* and the defendant's claims did not rise to the level of plain error. Since we rejected every claim of error, cumulative-error analysis is not necessary.

¶ 89                                III. CONCLUSION

¶ 90 For the foregoing reasons, we affirm the judgment of the circuit court of Franklin County.

¶ 91 Affirmed.