NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2024 IL App (4th) 231003-U

NO. 4-23-1003

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
November 21, 2024
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Winnebago County |
| HARRY WARREN LAWSON JR., | ) | No. 20CF652 |
| Defendant-Appellant. | ) | |
| | ) | |
| | ) | Honorable |
| | ) | Debra D. Schafer, |
| | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court.
Justices Steigmann and DeArmond concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The appellate court affirmed, holding (1) defendant's claim of ineffective
assistance of trial counsel failed where defendant did not establish that counsel's
failure to object to the substantive admissibility of two prior statements of a
witness resulted in prejudice, (2) the trial court did not err by failing to conduct a
preliminary *Krankel* inquiry, and (3) defendant was not deprived of a fair
sentencing hearing.

¶ 2   Defendant, Harry Warren Lawson Jr., appeals his conviction for first degree

murder. Defendant argues that (1) he was denied effective assistance of counsel when his

attorney stipulated to the admission of a witness's recorded police statement, where two of the

statements made by the witness were inadmissible as substantive evidence; (2) the trial court

erred by failing to conduct a preliminary inquiry into his posttrial claims of ineffective assistance

of counsel pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984); and (3) he was deprived of a

fair sentencing hearing where the court considered facts outside the record and failed to give any

mitigating weight to defendant's alcohol dependency. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4        The State charged defendant by indictment with first degree murder (720 ILCS

5/9-1(a)(2) (West 2020)), alleging that:

> "[Dylan Myers] and [defendant], committed the offense of FIRST DEGREE
>
> MURDER in that the defendant, or one for whose conduct he [*sic*] is legally
>
> responsible, who at the time of the commission of the offense was 18 years of age
>
> or older, without lawful justification, battered Steven Delorme about the head,
>
> abdomen and pelvis, knowing such acts created a strong probability of death or
>
> great bodily harm to Steven Delorme, thereby causing the death of Steven
>
> Delorme, and the death resulted from exceptionally brutal and heinous behavior
>
> indicative of wanton cruelty."

¶ 5                                    A. Bench Trial

¶ 6        The matter proceeded to a bench trial. Jenna Angileri, defendant's daughter,

testified that at the time of the incident, she lived with her father and Jeanelle Rill, his girlfriend.

She had been dating Dylan Myers for approximately one month at the time of the incident. On

the afternoon of the incident, Angileri was at a cookout at defendant's apartment with Myers,

defendant, Rill, and Delorme, who was defendant's friend. She testified Myers and Delorme

exchanged insulting comments throughout the day, and Delorme told Myers at one point that he

was going to "f*** [him] in the ass." Angileri stated that Delorme and defendant also "picked at

each other," though she did not believe they did this all night. Angileri's recorded interview with

police officers the day after the incident was admitted pursuant to section 115-10.1 of the Code

of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-10.1 (West 2022)). In her statement, Angileri told officers that Delorme had been arguing with defendant all night.

¶ 7        Angileri testified that, at approximately 5 or 6 p.m., she was standing near the bathroom, and Delorme grabbed her purse out of her hands. Myers saw this occur, and he started punching Delorme. Angileri ran into the bedroom and told defendant that Delorme tried to steal her purse and Myers and Delorme were fighting. Defendant got dressed and ran out of the room, yelling "how dare you steal stuff from my daughter." Angileri testified that after defendant ran out of the bedroom, she "remember[ed] just like running around the house, kind of just not knowing what to do, because [Myers] was still beating [Delorme], and [defendant] just was yelling." Angileri stated she "r[a]n around a lot" during the altercation, but she "mostly stayed in the bedroom." Angileri stated she did not remember telling the police that she saw defendant and Myers walk Delorme out of the bathroom while she was in the bedroom. However, in her recorded statement to the police, Angileri indicated she saw defendant and Myers walk Delorme out of the bathroom and past the bedroom door and he was not bleeding at that time.

¶ 8        Angileri testified that, while she was in the bedroom, she heard banging and defendant yelling. She did not see any fighting, but she heard it. She heard defendant yell "how dare you steal stuff from my daughter" and tell Delorme to leave. She did not remember telling the police she heard defendant say, "I'll stomp your brains out." However, Angileri is heard saying this in her recorded statement to the police. Angileri testified she stayed in the bedroom for approximately 15 minutes while the fighting occurred in the living room and Rill was in the bedroom with her. Angileri testified that she did not believe Rill left the room during that time, and she did not remember telling the police that Rill occasionally ran out of the bedroom to try to "pull [defendant] off" of Delorme and get him to calm down. The State published a portion of

- 3 -

Angileri's prior statement to the police in which she stated that Rill "ran out [of the bedroom] occasionally trying to pull [defendant] off and get him to the room to calm down."

¶ 9 Angileri testified that, once it was quiet, she exited the bedroom and saw Delorme sitting in a chair. Angileri stated Delorme told her that he was sorry and asked for a ride home. He was bleeding from his ears, nose, and mouth, and there was a lot of blood in the apartment. Angileri called her friend, Cartese Smith, around 8 p.m. and asked him to drive Delorme home. Smith arrived with his van, and defendant and Myers carried Delorme out to the van because he could not stand on his own. Smith and Myers left in the van with Delorme, and they returned without him about 15 minutes later. The next day, Angileri purchased cleaning supplies, and defendant cleaned the apartment.

¶ 10 Angileri testified that she did not see defendant strike Delorme at any point that evening. When asked if she told the police that defendant told her he punched Delorme, Angileri replied, "I guess I said that. I'm just—I'm sorry, it's been a long time. I don't really recall." The State published a portion of Angileri's recorded statement in which she told the police: "I know [defendant] said he punched [Delorme]." Angileri testified that she did not actually remember defendant saying that he punched Delorme. She stated she "rewrote that statement" because she did not remember that happening.

¶ 11 Myers testified that on the day of the incident, he was at a barbecue at defendant's apartment with Angileri, defendant, and Delorme. They were all drinking alcohol. Myers stated Delorme was drunk, disrespectful, and flirtatious with Angileri. Delorme told Myers he would "f*** [him] in the ass." Myers did not appreciate this, but he did not "react[ ] majorly" to it. At one point, Delorme grabbed Angileri's purse out of her hands and took it to the bathroom. Myers followed Delorme into the bathroom to get the purse back. Myers punched Delorme in the face

- 4 -

approximately five times in the bathroom. Myers then began walking Delorme to the door of the apartment and told him to leave. Delorme had a cut on his lip at that time.

¶ 12     Myers testified that defendant walked out of his bedroom and asked what was going on. Angileri told defendant Delorme tried to steal her purse and had been fighting with Myers. Defendant "kind of snapped." Defendant yelled and hit Delorme on the back of the head with his hand. Delorme fell down, and defendant began kicking him and stomping on his face while wearing Harley Davidson boots. Myers, Angileri, and possibly Rill pulled defendant off Delorme two or three times. Myers stated defendant said "something along the lines of, I'll kill you" and "I'll stomp your brains out." Myers stated that, after defendant stomped on Delorme's head, Delorme was bleeding from the side of his face.

¶ 13     Myers testified that, after the fight, he and Angileri briefly left the apartment to look for his phone. Angileri called Smith and asked him to drive Delorme home. At that time, Delorme was on the floor and was wearing a shirt and pants. Smith came over, and Myers, Smith, and defendant carried Delorme down the stairs to Smith's van. Myers and Smith got into the van with Delorme. Delorme was still talking at that time, and Myers stated he might have "smacked" Delorme while they were in the van. Smith was afraid to drop Delorme off at his residence, so they dropped him off at a different location. When asked if Delorme's pants were up at that time, Myers stated he "assume[d] so," but he did not know.

¶ 14     Myers testified he briefly returned to defendant's apartment after dropping Delorme off. Defendant was still drunk, and he was yelling "you f*** me, I f*** you, or something." Myers, Angileri, and Smith left the apartment. Myers returned to the apartment the next day, and they cleaned it. He was on the phone with his child's mother while they were cleaning, and he heard defendant say "something about f*** [Delorme] with a broom." Myers

stated he "didn't know what [defendant] was exactly saying" at the time, but his child's mother reminded him of the conversation later when he was incarcerated. Myers acknowledged that he initially lied to the police and told them he was not present in the apartment on the night of the incident, but he eventually "told them the truth."

¶ 15        Janice Dotson testified that, on the day of the incident, defendant and Rill lived in the apartment building next door to her residence. On the afternoon of the incident, Dotson observed that defendant, Rill, Angileri, Angileri's boyfriend (who defendant had previously introduced to her as his son), and a "Hispanic man" were present at defendant's apartment. They were drinking and listening to loud music. At some point, Dotson observed through her window that Rill was dancing in the kitchen and the Hispanic man was close to her. Defendant entered the kitchen and appeared upset. He left the kitchen, and Angileri's boyfriend then entered the kitchen and yelled at the Hispanic man.

¶ 16        Dotson stated that, at that point, "[t]he music kept going and the movement got thicker and loudness got louder. And we seen some movement. Some movement. It was movement." Dotson stated, "They were all like dancing." The State asked Dotson if the movement "was in a dance fashion or some other fashion." Dotson replied, "I've never seen dancing like that." Dotson stated the Hispanic man appeared "defensive," like he was "trying to move out of the way." Dotson stated she saw defendant and Angileri's boyfriend throw punches and it looked like the punches were directed toward the Hispanic man. Later that evening, she saw defendant and Angileri's boyfriend take the Hispanic man outside and place him in a van. They were holding him up because he could not walk.

¶ 17        Smith testified that, on the evening of the incident, Angileri called him at work and asked him for help. She sounded "frantic." He had dropped Angileri, Myers, defendant, and

- 6 -

Delorme off at defendant's apartment for a cookout earlier that day. Smith proceeded to the apartment after receiving the call from Angileri. He saw blood on the floor and Delorme sitting in a chair bleeding. Everyone was "frantic" and trying to figure out what to do. Delorme was wearing clothing at that time. Smith, Myers, and defendant carried Delorme down the stairs, and Smith and Myers placed him in Smith's van. Delorme was in and out of consciousness at that time. Smith and Myers dropped Delorme off at a factory approximately one block from his residence. Someone came out of the factory, and Smith and Myers drove away. Smith dropped Myers off and returned to his apartment. The next day, Smith drove back to defendant's apartment. Everyone was trying to figure out how to clean up the mess, and he assisted in the cleaning.

¶ 18        Smith testified that, while Delorme was in the vehicle, he said "no," "stop," and "everyone is going to know." Smith saw Myers strike Delorme three or four times in the van because he continued talking. Delorme was wearing pants when he was in the van, and Smith never saw anyone pull his pants down. After Smith and Myers pushed Delorme out of the van, the van smelled like blood and a "[f]aint trace of feces." Smith stated these smells came from Delorme. Defense counsel asked if the vehicle smelled like feces because Myers sodomized Delorme inside the vehicle. Smith replied, "I believe so, yes, sir." Myers later acknowledged he did not know what the word "sodomize" meant and stated he thought it meant "brutally beat." Smith stated he did not see Myers or anyone else insert an object into Delorme's anus.

¶ 19        Frederick Kaehler testified that on March 25, 2020, at approximately 9:30 p.m., he observed a van drive up to the building where he was working via a security camera. The van remained parked for approximately five minutes. Kaehler went out to see what was going on,

and he saw that people had exited the van. He yelled at them, and the van drove away. He then observed a man lying on the ground. The man was unresponsive, so Kaehler called 911.

¶ 20 Kevin Clouston of the Rockford Police Department and James Graham of the Rockford Fire Department testified that they were dispatched to Kaehler's place of business on the night of the incident, which Clouston described as an "open industrial lot." They observed a man lying on the ground with facial trauma. Graham stated the man was not wearing a shirt and his pants were down around his knees. Graham indicated the man was semiconscious and did not respond to emergency responders. The man was taken to the hospital. Detective Dan Stewart of the Rockford Police Department testified the man was identified as Delorme the next day.

¶ 21 Dr. Stathis Poulakadis, a trauma and burn surgeon, testified that he operated on Delorme on the night of the incident. Poulakadis testified Delorme suffered a "through-and-through perforation" of his colon and his spleen and pancreas were severely injured. Poulakadis opined that the injuries were consistent with Delorme having been anally penetrated with an instrument that was at least three feet long. Delorme also suffered a subdural hematoma, which Poulakadis described as "blood around the outside of the brain in response to a blunt force trauma or some type of trauma to the brain." Poulakadis testified that he and other medical personnel had to remove the damaged portion of Delorm's colon and "bring out a colostomy." They also had to remove Delorme's spleen and the back half of his pancreas. Delorme briefly woke up and indicated he had been penetrated through the rectum.

¶ 22 Poulakadis testified that Delorme was released to a rehabilitation facility for approximately two weeks. However, he began bleeding spontaneously in his abdomen, readmitted to the hospital, and died. Poulakadis opined that the injuries Delorme sustained on the day of the incident ultimately caused his death. Poulakadis stated that Delorme's head injuries

did not impact the healing of his abdominal injuries "directly," but "the conglomeration of the multiple injuries" put him at a higher risk for death.

¶ 23         Mark Peters, a forensic pathologist, testified that he conducted an autopsy on Delorme's body. After examining Delorme's body and reviewing his medical records, Peters determined Delorme died of "multiple medical conditions caused by blunt trauma of the head, abdomen and pelvis."

¶ 24         Detective Stewart testified that officers talked to Delorme's roommate the day after the incident and learned that he may have been with defendant on the day of the incident. Stewart proceeded to defendant's residence and observed a van parked outside. Based on the license plate number and description officers had received from Kaehler, Stewart believed the van may have been the one that was involved in the incident. He noticed the windows to the residence were open and it smelled like bleach.

¶ 25         Stewart stated he interviewed defendant on the evening of March 26, 2020. A copy of the recording was admitted into evidence and played for the trial court. In the interview, defendant stated he had a cookout at his residence the day before. Myers, Smith, Angileri, Rill, and Delorme were there, and they were all drinking alcohol. Defendant went to bed at approximately 8 p.m. Before he fell asleep, defendant and Rill watched a movie in their bedroom with the surround sound on, and defendant could not hear anything going on outside the bedroom. The others were in the living room while defendant and Rill watched the movie. Defendant stated he woke up at 6:30 a.m., and Angileri, Myers, Smith, and Rill were at the apartment at that time. Defendant did not see any blood in the residence. Defendant stated that he loved Delorme and Delorme was "like a brother" to him. Defendant said Delorme was not a troublemaker or a fighter, but Myers was a "gangbanger," "arrogant," and "kind of an a***." He

also stated that Myers was on parole and that if anyone "got into it" with Delorme, it would have been Myers.

¶ 26    Evidence was presented that a forensic scientist performed DNA testing on swabs of blood taken from a chair in defendant's apartment, a blanket found in the van, and the floor of the van, and Delorme was included as a contributor to the DNA profiles found on these swabs.

¶ 27    After hearing closing arguments, the trial court took the matter under advisement.

¶ 28    The trial court subsequently announced its ruling. The court found the evidence showed that Delorme attended a cookout at defendant's residence and, during the course of it, was beaten and sexually assaulted. The court noted that defendant "denied knowing anything about anything" during his interview with the police. The court stated that, despite introducing Myers to Dotson as his son, defendant "push[ed] the police in the direction of [Myers]." The court also noted that despite telling the police that he loved Delorme and that Delorme was like a brother to him, defendant never asked how he was doing. The court stated that Myers initially lied to the police but later "came at least partially clean" by admitting to beating Delorme, though he said nothing to the police about a sexual assault. The court stated: "I don't have to find who specifically sexually assaulted [Delorme], but the State has proven that it has happened." The court also found the State had proven "that the two men responsible for the beating were acting in concert with no evidence of withdrawal such that one would not be accountable for the actions of the other." The court found defendant guilty of first degree murder. The court also found that the murder was "committed by exceptionally brutal or heinous behavior indicative of wanton cruelty."

¶ 29                          B. Posttrial Motion

¶ 30    On April 26, 2023, defendant, through counsel, filed a motion for a new trial. The motion alleged, *inter alia*, that the trial evidence was insufficient and that the State's case relied on Myers's testimony, which was not credible.

¶ 31    On July 28, 2023, a hearing was held on the motion for a new trial and for sentencing. The trial court first considered and denied defendant's posttrial motion. The court stated it did not believe Myers or any other witness had been "fully forthcoming" about what happened in the apartment on the night of the incident, as no one admitted to having knowledge of Delorme being sodomized. However, the court found Myers's testimony was credible as to defendant's involvement in the beating of Delorme, which ultimately led to his death.

¶ 32    The trial court noted that Angileri stated she did not recall defendant telling her that he hit Delorme, but her prior statement to that effect was admitted as substantive evidence. The court stated that, "beyond that, it[ was] also note worthy what she didn't say." The court noted that Angileri testified that she went into the bedroom and told defendant what was happening outside. Angileri stated defendant then got upset and left the bedroom, and she subsequently heard a fight outside the bedroom. The court noted that Angileri did not testify that she heard defendant tell Myers to stop. The court stated: "Instead all she testified to was that *** she could hear a fight going on. And that [defendant] was angry. That does in fact corroborate the testimony of [Myers]."

¶ 33    While the trial court was delivering its ruling on the posttrial motion, defendant repeatedly interjected commentary concerning his assessment of the facts of the case. The court stated it would proceed to sentencing.

¶ 34                        C. Sentencing

¶ 35        A presentence investigation report (PSI) was prepared in advance of the sentencing hearing. The PSI showed defendant had 11 prior felony convictions and numerous convictions for misdemeanors and traffic offenses. Many of his convictions were for traffic offenses, property offenses, and offenses related to drugs and alcohol, but he also had prior convictions for burglary, robbery, battery, aggravated battery, and domestic battery. His prior criminal history spanned from 1979 to 2017.

¶ 36        The PSI stated that defendant reported that he began consuming alcohol regularly when he was approximately 10 years old. He reported he consumed beer daily throughout his life and experienced withdrawal effects when he stopped. He last drank alcohol on the day of his arrest, and he believed he suffered from an alcohol abuse problem. Defendant's probation records showed he completed a drug treatment program between October 2005 and April 2006 and attended Alcoholics Anonymous and Narcotics Anonymous meetings in 2006. He also completed DUI treatment in 1999. An amended PSI listed the status of his codefendants and stated Myers had been sentenced to 35 years' imprisonment for the first degree murder of Delorme on May 19, 2023.

¶ 37        The trial court asked the parties if they had received the PSI and two addendums. The parties indicated they had received the documents. The following exchange occurred:

        "THE COURT: All right. And [defense counsel], have you had a chance to go over those with your client.

        MR. LEE [(DEFENSE COUNSEL)]: Yes.

        [DEFENDANT]: No.

        MR. LEE: Yes, [Y]our Honor.

[DEFENDANT]: Five times I sit down with that man in 14 months. I don't have a paper myself saying what I am charged with right now. He is a real good lawyer. I know he used to work with you and go to lunch, but that shouldn't have nothing to do with this. I just said that throughout for my appeal. And I got some other things I would like to bring up here, too.

THE COURT: [Counsel], you have gone over the [PSI] with your client?

MR. LEE: I have, [Y]our Honor, including the two addendums. I would indicate to the Court that in the process of reviewing the most recent information in the [PSI], [defendant] did walk out on me during a meeting in the jail.

[DEFENDANT]: You didn't defend me at all."

The court then asked the parties if they were prepared to proceed to sentencing. The State and defense counsel indicated they were. Defendant then stated, addressing defense counsel, "You didn't help me at all."

¶ 38      Several of Delorme's family members read victim impact statements, and the parties made their sentencing arguments. The State argued that defendant should be sentenced to natural life imprisonment. During the State's argument, defendant repeatedly commented on what the prosecutor was saying. The trial court told defendant to stop talking. The court stated it had been treating defendant's "mutterings" as attempts to communicate with his attorney, but it understood that defendant was "just trying to insert [his] commentary."

¶ 39      Defense counsel argued that defendant should receive a "minimal" sentence. Defense counsel stated defendant suffered from alcoholism and argued the court should consider whether defendant was "principally guilty" of brutal and heinous behavior. Counsel stated: "And I would hope that the Court in having presided over both [defendant's] trial, but also the trial of

- 13 -

[Myers] would discern that [Myers] is the person who was directly physically responsible for *** what Mr. Delorme was subjected to."

¶ 40            The trial court asked defendant if he wished to make a statement in allocution, and defendant stated he did not. The court stated it had considered the trial evidence; the PSI; the victim impact statements; the history, character, and attitude of defendant; and the parties' arguments. The court noted that defendant had an extensive prior criminal history, including several prior convictions for domestic battery. The court stated: "The overwhelming evidence from reviewing the [PSI] relates to alcohol abuse. *** I don't consider that a factor in aggravation or mitigation. It simply is an explanation for why we have the [PSI] that we have." The court noted that the trial evidence showed defendant and Myers were both under the influence of alcohol on the evening of the incident.

¶ 41            The trial court noted that Myers was also "a primary actor" in the events that led to Delorme's death. The court stated it did not know whether Myers or defendant was primarily responsible for sodomizing Delorme. The court stated:

> "But at any rate, I do consider the fact that [Myers] was sentenced to 35 years. I know that was in part because he was offered that as a cap to testify. I did say at [Myers's] sentencing that if it had been—if it had not been for that cap, his sentence would have been more."

The court stated that, because Myers was significantly involved in Delorme's death and received a 35-year sentence, it would not impose a natural life sentence on defendant. The court sentenced defendant to 70 years' imprisonment.

¶ 42            Defendant filed a motion to reconsider sentence, arguing, *inter alia*, that the court "failed to give weight to the role the Defendant's alcoholism had on the offense, and the

- 14 -

Defendant's potential to address his alcoholism while in custody" and the sentence was excessive in light of Myers's sentence because Myers had been convicted for similar conduct and had "played the primary role in causing the offense."

¶ 43      The trial court denied the motion to reconsider sentence. The court stated: "At the time that I gave my sentence, of course, I had heard the trial. It was the second trial relating to these facts. I had participated in the Dylan Myers' trial as well, who is the codefendant." The court stated the facts of the case were "particularly egregious in terms of the mechanism by which Mr. Delorme died." The court found its sentence was appropriate in light of defendant's criminal history. The court stated it understood defendant was "apparently an alcoholic," but it found his alcohol use did not "in any way excuse what happened." The court acknowledged that Myers received a "substantially reduced sentence" based on an agreement he negotiated with the State in exchange for his testimony in defendant's case. The court stated it did not believe this warranted a reduction in defendant's sentence. The court noted defendant had a more extensive prior criminal history than Myers and that it had never determined that Myers was primarily responsible, as defense counsel claimed.

¶ 44      This appeal followed.

¶ 45                    II. ANALYSIS

¶ 46      On appeal, defendant argues that (1) he was denied the effective assistance of counsel when his attorney stipulated to the admission of two portions of Angileri's recorded police statement, (2) the trial court erred by failing to conduct a preliminary *Krankel* inquiry into his *pro se* posttrial claims of ineffective assistance of counsel, and (3) he was deprived of a fair sentencing hearing where the court considered facts outside the record and failed to give any mitigating weight to defendant's alcohol dependency.

¶ 47                                  A. Ineffective Assistance of Counsel

¶ 48          Defendant argues his trial counsel was ineffective for failing to object to the admission of two of Angileri's statements from her recorded police interview that were admitted as substantive evidence at trial—namely her prior statements that defendant told her he hit Delorme and that Rill occasionally left the bedroom during the fight to try to pull defendant off Delorme. Defendant argues these statements were not admissible as substantive evidence because Angileri had no firsthand knowledge of the events she described, as she was in the bedroom during the time these things allegedly occurred. Defendant contends he was prejudiced by the admission of these statements because the evidence was close and the only other evidence that he was involved in the beating of Delorme came from two unreliable witnesses—Myers and Dotson.

¶ 49          A criminal defendant has the right to the effective assistance of counsel under the United States Constitution and the Illinois Constitution. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8. Our supreme court has adopted the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), for analyzing claims of ineffective assistance of counsel. *People v. Albanese*, 104 Ill. 2d 504, 526 (1984). Under this standard, "[t]o prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced the defendant." *People v. Domagala*, 2013 IL 113688, ¶ 36. That is, "a defendant must show that his attorney's representation fell below an objective standard of reasonableness and that a reasonable probability exists that, but for counsel's errors, the result of the proceeding would have been different." *People v. Webb*, 2023 IL 128957, ¶ 21. A defendant's failure to satisfy either prong precludes a finding of ineffective assistance of counsel. *Id.*

¶ 50 Relevant to this appeal, section 115-10.1 of the Code (725 ILCS 5/115-10.1 (West 2022)) provides that a prior statement of a witness is admissible as substantive evidence if the statement is inconsistent with the witness's trial testimony, the witness is subject to cross-examination concerning the statement, the statement "narrates, describes, or explains an event or condition of which the witness had personal knowledge," and "the statement is proved to have been accurately recorded by a tape recorder, videotape recording, or any other similar electronic means of sound recording." Our supreme court has held that "in order for a prior inconsistent statement to be admissible under section 115-10.1 of the Code, the witness must have actually perceived the events that are the subject of the statement, not merely the statement of those events made by the defendant." *People v. Simpson*, 2015 IL 116512, ¶ 41. The *Simpson* court noted that a contrary interpretation of section 115-10.1 would "keep the personal knowledge requirement from doing what it was designed to do—ensure that out-of-court statements are trustworthy." *Id.* ¶ 32.

¶ 51 In the instant case, Angileri testified that she mostly stayed in the bedroom after she told defendant Delorme had grabbed her purse and that he was fighting with Myers. She stated she heard but did not view the fighting after defendant ran out of the bedroom and she did not see defendant strike Delorme. Accordingly, her prior statement that defendant told her he hit Delorme was not based on events she personally perceived and likely would have been excluded had defense counsel objected. However, Angileri testified that Rill was in the bedroom with her during the fight. Accordingly, Angileri would have been able to see Rill leave the bedroom during the fight and could have heard her attempt to pull defendant off Delorme or calm him down. Thus, defendant has not shown Angileri's statement concerning Rill leaving the room was not based on events Angileri personally perceived such that it was inadmissible under section

115-10.1 of the Code. Accordingly, defendant has not shown defense counsel performed deficiently by failing to object to the admission of this statement.

¶ 52 However, even if we were to find trial counsel performed deficiently by failing to object to the admissibility of one or both of these statements by Angileri, defendant has not shown he was prejudiced by their admission. "In assessing prejudice under *Strickland*, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently." (Internal quotation marks omitted.) *People v. Johnson*, 2021 IL 126291, ¶ 54. Rather, the question is whether it is reasonably likely that the result would have been different. *People v. Lewis*, 2022 IL 126705, ¶ 46. "A defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

¶ 53 Here, a reasonable probability does not exist that the outcome of the trial would have been different if the statements at issue had been excluded. Myers testified that defendant hit Delorme and stomped on his head multiple times. While defendant argues that Myers was not credible, the trial court expressly found his testimony to be credible as to defendant's involvement in the beating. The court also found that Myers's testimony was corroborated by the unchallenged portions of Angileri's testimony—namely, Angileri's testimony that defendant got angry when she told him what was happening with Delorme, defendant then walked out of the bedroom, and Angileri subsequently heard fighting outside the bedroom. We note that Angileri stated in an unchallenged prior statement admitted under section 115-10.1 of the Code that she heard defendant yell that he would "stomp [Delorme's] brains out" and Myers testified that he

heard defendant say this as well. Though Dotson's testimony was somewhat confusing and disjointed, it also supported Myers's testimony that defendant participated in beating Delorme. Dotson testified that she saw defendant throw punches at a "Hispanic man," and it could be inferred from the other trial evidence that this was Delorme.

¶ 54          Also, while delivering its ruling, the trial court extensively discussed the version of events defendant gave to the police during his interview, in which he denied any knowledge of the beating or participation in the cleanup. Defendant's version of the events was inconsistent with that of every other witness, including Myers, Angileri, and Smith, and the court clearly found it to be incredible. The court could have determined defendant's statement to the police was false and considered it to be evidence of consciousness of guilt. See *People v. Walker*, 2020 IL App (4th) 180774, ¶ 93 ("Lying to the police may be considered evidence of consciousness of guilt." (Internal quotation marks omitted.)).

¶ 55          Given the foregoing evidence, a reasonable probability does not exist that the result of the trial would have been different if Angileri's prior statements that defendant told her that he hit Delorme and that Rill occasionally ran out of the bedroom to try to "pull [defendant] off" and calm him down had been excluded.

¶ 56                        B. Preliminary *Krankel* Inquiry

¶ 57          Defendant argues that the trial court erred by failing to conduct a preliminary *Krankel* inquiry after he expressed his discontent with trial counsel during the hearing on his posttrial motion. Specifically, defendant notes that he advised the court that counsel had only met with him five times in 14 months and that counsel did not "defend [him] at all." Defendant contends these comments amounted to an assertion that his counsel had been ineffective and the court erred by failing to engage in a *Krankel* inquiry in response to the comments.

¶ 58    When a defendant makes a *pro se* posttrial claim of ineffective assistance of counsel, a common-law procedure, which evolved from our supreme court's decision in *Krankel* and its progeny, is triggered. *People v. Ayres*, 2017 IL 120071, ¶ 11. "This procedure serves the narrow purpose of allowing the trial court to decide whether to appoint independent counsel to argue a defendant's *pro se* posttrial ineffective assistance claims." (Internal quotation marks omitted.) *Id.* Under this procedure, the court must conduct an inquiry sufficient to determine the underlying factual basis, if any, for the *pro se* claim of ineffective assistance of counsel. *Id.* If, after conducting the inquiry, the court determines the claim lacks merit or pertains only to matters of trial strategy, the court need not appoint new counsel and may deny the *pro se* motion. *People v. Roddis*, 2020 IL 124352, ¶ 35. However, if the *pro se* allegations demonstrate possible neglect of the case, new counsel should be appointed to represent the defendant on his claims of ineffective assistance of counsel. *Id.*

¶ 59    A defendant need only bring his or her claim to the trial court's attention to trigger the court's duty to conduct an inquiry. *Ayres*, 2017 IL 120071, ¶ 24. "[W]hen a defendant brings a clear claim asserting ineffective assistance of counsel, either orally or in writing, this is sufficient to trigger the trial court's duty to conduct a *Krankel* inquiry." *Id.* ¶ 18. Whether defendant's comments were sufficient to trigger the trial court's duty to conduct a preliminary *Krankel* inquiry is a question of law, which we review *de novo*. *People v. Taylor*, 237 Ill. 2d 68, 75 (2010).

¶ 60    Here, we find defendant's comments were not sufficient to trigger the trial court's duty to conduct a preliminary *Krankel* inquiry. Prior to sentencing, defendant advised the court that counsel had met with him five times in 14 months. However, this statement, by itself, is not

a clear assertion that counsel's contact with defendant was insufficient or that counsel provided ineffective assistance.

¶ 61        Defendant subsequently stated, addressing his attorney, "You didn't defend me at all," and "You didn't help me at all." We find these comments also did not bring a clear claim of ineffective assistance of counsel to the trial court's attention. The transcript of the hearing shows that defendant had a pattern of interjecting commentary—characterized by the court as "mutterings"—while the court and the attorneys were speaking, expressing his dissatisfaction with what they were saying. Given this context, we conclude that defendant's statements, to the extent they were even heard by the court, were made more as insults toward his attorney for the purpose of disparaging him rather than an attempt to bring a claim of ineffective assistance of counsel to the court's attention. Accordingly, we find the trial court did not err by failing to conduct a preliminary *Krankel* inquiry.

¶ 62                                C. Sentencing

¶ 63        Defendant argues he was deprived of a fair sentencing hearing where the trial court failed to give any mitigating weight to his alcohol dependency and improperly considered facts outside the record. We address each argument in turn.

¶ 64                1. *Failure to Consider Alcohol Dependency in Mitigation*

¶ 65        Defendant argues that the trial court erred by failing to consider evidence of his alcohol dependency to be mitigating at sentencing. However, alcoholism is not an inherently mitigating factor. *People v. Prather*, 2022 IL App (4th) 210609, ¶ 39. Rather, our supreme court has recognized that "evidence of a history of substance abuse is a double-edged sword because this evidence can be viewed as either aggravating or mitigating." *People v. Ward*, 187 Ill. 2d 249, 261 (1999); see *People v. Mertz*, 218 Ill. 2d 1, 83 (2005) ("Simply because the defendant

views his substance abuse history as mitigating does not require the sentencer to do so."). Here, the PSI showed defendant had an alcohol dependency for most of his life and had committed multiple crimes while abusing alcohol. Though the PSI indicated defendant received substance abuse treatment through probation and attended Alcoholics Anonymous in 2005 and 2006, he continued to use alcohol regularly and commit crimes. The trial evidence showed defendant consumed alcohol on the day he participated in the beating of Delorme as well. Under these circumstances, the court was within its discretion in finding defendant's history of alcohol abuse was not a mitigating factor in this case.

¶ 66                      2. *Consideration of Facts Outside the Record*

¶ 67            Defendant argues that the trial court improperly considered facts outside the record in sentencing him when the court considered Myers's trial and sentencing, criminal history, and conduct and determined Myers deserved a lesser sentence. Defendant argues it is impossible to conclude that the court's improper consideration of these matters did not result in a harsher sentence for him.

¶ 68            Defendant acknowledges that he failed to raise the issue of the trial court's improper consideration of matters outside the record at the sentencing hearing or in his motion to reconsider sentence but argues the issue is reviewable under either prong of the plain error doctrine. "It is well settled that, to preserve a claim of sentencing error, both a contemporaneous objection and a written postsentencing motion raising the issue are required." *People v. Hillier*, 237 Ill. 2d 539, 544 (2010). However, forfeited errors may be reviewed under the plain error doctrine. *Id.* at 545. To establish plain error, a defendant must first show that a clear or obvious error occurred. *Id.* "In the sentencing context, a defendant must then show either that (1) the

evidence at the sentencing hearing was closely balanced, or (2) the error was so egregious as to deny the defendant a fair sentencing hearing." *Id.*

¶ 69 "[I]nvited errors are not subject to plain-error review." *People v. Ramirez*, 2013 IL App (4th) 121153, ¶ 79. "Under the doctrine of invited error, an accused may not request to proceed in one manner and then later contend on appeal that the course of action was in error." *People v. Carter*, 208 Ill. 2d 309, 319 (2003). "To permit a defendant to use the exact ruling or action procured in the trial court as a vehicle for reversal on appeal 'would offend all notions of fair play' [citation], and 'encourage defendants to become duplicitous.' " *People v. Harvey*, 211 Ill. 2d 368, 385 (2004). "Thus, invited error does not raise a mere forfeiture to which the plain-error exception might apply; it creates an estoppel that precludes plain-error analysis." *People v. Holloway*, 2019 IL App (2d) 170551, ¶ 44.

¶ 70 "Deliberations of the court must necessarily be limited to the record before it." *People v. Steidl*, 177 Ill. 2d 239, 266 (1997). "A determination made by the trial judge based upon a private investigation by the court or based upon private knowledge of the court, untested by cross-examination, or any of the rules of evidence constitutes a denial of due process of law." (Internal quotation marks omitted.) *People v. Dameron*, 196 Ill. 2d 156, 171-72 (2001).

¶ 71 In this case, the fact that Myers was sentenced to 35 years' imprisonment was properly before the trial court, as this fact was included in the PSI. It does not appear that the court's consideration of Myers's 35-year sentence led to a longer sentence for defendant. In fact, the court indicated it would not impose a natural life sentence, as the State had requested, in light of Myers's 35-year sentence.

¶ 72 However, even if we were to accept defendant's argument that the trial court's consideration of its knowledge of Myers's trial and sentencing proceedings was erroneous, such

error was invited by defendant. At the sentencing hearing, defense counsel argued that, based on the evidence presented at both defendant's trial and Myers's trial, the court should find that Myers, rather than defendant, was "directly physically responsible" for the brutal and heinous conduct Delorme was subjected to. In so doing, defense counsel requested the court to rely, in part, on its knowledge of Myers's trial to find defendant was less culpable.

¶ 73          Also, in his motion to reconsider sentence, defendant raised a disparate sentence claim, arguing that his sentence was excessive as compared to Myers's sentence. In order to address this argument, the trial court was required to consider the relative circumstances of defendant and Myers, including the fact that Myers had negotiated a deal with the State whereby the State would recommend a 35-year sentencing cap in exchange for him testifying against defendant. See *People v. Moss*, 205 Ill. 2d 139, 171 (2001) ("In comparing the sentences, this court considers the nature of the offense, each individual's relative involvement, character, background, criminal record, and potential for rehabilitation."); *People v. Caballero*, 179 Ill. 2d 205, 218 (1997) ("[D]ispositional concessions are properly granted to defendants who plead guilty when the interest of the public in the effective administration of criminal justice would thereby be served.").

¶ 74          Thus, defense counsel's sentencing arguments, both at the sentencing hearing and in his motion to reconsider sentence, invited the trial court to consider both the evidence presented in Myers's trial and the circumstances of his sentencing. Defense counsel attempted to secure a lower sentence for defendant by requesting that the court consider these matters. Accordingly, defendant is estopped from arguing on appeal that the court's consideration of these matters was erroneous. See *Carter*, 208 Ill. 2d at 319.

¶ 75                              III. CONCLUSION

¶ 76        For the reasons stated, the judgment of the trial court is affirmed.

¶ 77        Affirmed.